No. 99,794

STATE OF KANSAS, *Appellee*, v. KARLAN D. RANSOM, *Appellant.*

(212 P.3d 203)

Opin-
ion filed July 24, 2009. 

*Nancy Ogle*, of Ogle Law Office, L.L.C., of Wichita, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: A jury convicted Karlan D. Ransom of two counts of felony murder and two counts of attempted aggravated robbery. On this direct appeal Ransom argues that evidence seized from his house should have been suppressed because his girlfriend either did not consent or consented involuntarily, or because law enforcement did not seek his consent; that evidence regarding items found in the house was irrelevant and unduly prejudicial; and that he should have been permitted to strike a prospective juror for cause.

## Factual and Procedural Background

On the evening of March 20, 2006, Ransom; Christopher Gant; Jeremy Miles; and Ransom's cousin, Kendrall, attempted an aggravated robbery, which led to the death of Donta McDonald. Later that evening, Ransom and two of the others attempted a second aggravated robbery of a drug house, which led to the death of Christopher Spain Bey. We previously discussed events leading up to and immediately following the two attempted aggravated robberies and felony murders in *State v. Gant*, 288 Kan. 76, 201 P.3d 673 (2009), and *State v. Ransom*, 288 Kan. 697, 207 P.3d 208

(2009). Another complete recitation of these events is not necessary here.

Two days after the crimes, Detective Jason Pfeiffer of the Wichita Police Department (WPD) received an anonymous tip, leading officers to a house rented by Ransom's girlfriend, Sharondi Washington. There, officers conducted a warrantless search, finding several weapons. The State charged Ransom with two counts of felony first-degree murder under K.S.A. 21-3401(b) and two counts of attempted aggravated robbery under K.S.A. 21-3301 and K.S.A. 21-3427.

Ransom filed a motion to suppress the evidence seized from the house, arguing that the officers lacked Washington's consent. At the motion hearing, Washington testified that, on the evening of the search, 9 or 10 officers surrounded her house, pounded on her door and windows, and yelled that they wanted to talk about a homicide. Washington testified that she called her grandmother and informed the officers that she would not step outside until her grandmother arrived. According to Washington, the officers nevertheless continued to pound on the windows of the house, yelling that they would get a search warrant.

Washington testified that she finally saw her grandmother arrive, stepped out of the house, and had a friend lock the door behind her. An officer immediately approached and asked if she would talk to him in a patrol car. She agreed, sitting in the passenger seat. One officer sat in the driver seat and another in the back seat.

Washington insisted throughout her testimony that, despite the officers' persistence, she never consented to a search of her house. She acknowledged that she admitted there was marijuana in the house and that she provided false names of the people inside. Washington also testified that she informed the officers twice that she needed to use the bathroom. Eventually, she said, one of the officers left the car and another came back. That officer told her that she could use the bathroom in the house as long as an officer accompanied her. Washington testified that she agreed to this arrangement because she "really had to go"; Washington then returned to the house and asked her friend to open the door. As the

door opened, she said, officers pushed her to one side and ran in. Washington said that she was then escorted back to the car.

Several officers also testified at the motion to suppress hearing, disputing certain elements of Washington's evidence.

WPD Detective Patrick Leon testified that six to eight detectives and officers surrounded Washington's house and knocked on the door. Washington walked outside and agreed to talk with Leon and Detective Brad Elmore in an unmarked car. Washington admitted there was marijuana in the house. Soon thereafter, Elmore left the car, and Leon asked Washington for her consent to search the house; Washington consented. Officers then accompanied Washington to the house so she could inform the individuals inside to open the door. Leon explained that Washington did not go into the house at that time, but he believed that she was permitted to use the bathroom after officers completed their search.

Elmore also testified, saying detectives asked Washington to talk in the car only because it was snowing at the time. Elmore also stated that he left the car because he wanted to inform his supervising lieutenant, Jeff Easter, that Washington had admitted there was marijuana in the house. Elmore testified that he and Easter agreed they should seek a search warrant for the house. Elmore then returned to the car, where he learned that in his absence Washington had consented to a search of the house. Elmore said he then confirmed Washington's consent; "I asked is it okay if we do that, if we go in. We want to search for weapons, we want to look for anybody that might be in the house, and we would also like to talk with them, if that's okay and she said it was."

Pfeiffer also testified, describing the entry into the house and the search. Once Pfeiffer came through the door, he said, he immediately discovered Ransom and Miles walking down stairs to the main level. Both men were patted down and seated on a couch. Pfeiffer then went into the kitchen and walked down the stairs leading to the basement. There, he lifted a mattress and discovered two handguns and a sawed off shotgun. Pfeiffer said Ransom and Miles were then handcuffed and taken to be interviewed. On cross-examination, Pfeiffer admitted that officers and detectives knocked

on Washington's doors and windows for 10 minutes before she came outside.

Easter testified that Elmore had approached him about applying for a search warrant because of Washington's admission about the marijuana in the house. Easter disputed Washington's story that she waited to step outside until her grandmother arrived, testifying that Washington's grandmother did not come to the scene until officers were entering the house.

Washington's grandmother testified that she drove to Washington's house to drop off Washington's sister, Sasha Beard. The grandmother said that Washington had not called her, and she was unaware officers were at Washington's house until she arrived.

Beard testified that Washington had called her and said that several officers were surrounding the house. Once Beard arrived at the house, she said, she called Washington and told her to come outside. An officer then approached the car in which the grandmother and Beard were sitting and asked Beard if she lived in the house. Beard said yes, and the officer asked her to sit in a police car. Beard testified that she and Washington were eventually placed in the same car. While together, she heard officers ask Washington for consent to search the house. Washington said no. Beard also testified that at some point Washington asked to use the bathroom; the officers agreed; they took Washington to the door and then rushed into the house.

Ransom testified that he stayed six out of seven nights at Washington's house and kept clothes, shoes, a toothbrush, and hygiene products there. He said his mail was delivered to another address. Ransom also testified that he helped Washington pay rent and for food and medicine. He also claimed that he was not aware officers were beginning to search the house while he sat on the couch.

The district judge determined that Ransom had standing to pursue the motion to suppress but rejected the motion on its merits. The judge ruled:

"This is very much a credibility issue. The Court finds that the police officers under the circumstances are more credible with regard to this. And the Court finds that . . . Washington did verbalize consent to search. With regard to the

issue of voluntariness, the Court finds under the facts and circumstances of the case the consent was given voluntarily.

"[U]nder the circumstances, the Court finds . . . Ransom could have stepped forward and should have in order to stop the [police search]."

The case proceeded to trial where, during voir dire, a prospective juror, employed as a home health nurse, admitted that she might have trouble presuming Ransom's innocence:

"[Ransom's counsel]: . . . [W]ould you say you recognize the problem you have looking at him and saying he's presumed innocent?

"[Prospective Juror C]: Yes.

"[Ransom's counsel]: And when you consider the evidence, will you be able to sit there and say, you know, I'm going to make sure I have that in mind, try to be the best juror I can?

"[Prospective Juror C]: Honestly, I would try, yes.

. . . .

"[Ransom's counsel]: So that's making it probably hard for you to look at him and say I'm presuming him innocent, even though I'm going to have heard something that sounds like he might be involved, it's not adding up, right?

"[Prospective Juror C]: Right.

"[Ransom's counsel]: . . . Will you be able to be fair to him . . . and be fair to him in the trial?

"[Prospective Juror C]: I would try. Yes.

"[Prospective Juror C]: My concern is I said that things that I've seen dealing with the other side of the family and about that also that I would be a little bit judgmental seeing the family.

. . . .

"[Ransom's counsel]: It sounds to me like it's your work experience that's kind of really affecting the way you're going to look at this case?

"[Prospective Juror C]: Right."

Ransom later requested that this prospective juror be removed for cause. When the district judge refused to remove the panel member for cause, Ransom used one of his peremptory challenges to remove her. The district court judge did remove for cause two jurors who had said they could not honor the presumption of Ransom's innocence.

During trial, Jeri Lema, a WPD crime scene investigator, described the pictures she took at Washington's home, briefly mentioning that she (1) took a picture of an air gun found in a closet and (2) collected bloodstained clothing, including a hooded sweatshirt and shoes, to prove who lived in the house. Ransom sought

and obtained a continuing objection, arguing that the evidence was obtained through an unlawful search. His counsel asked several questions on Lema's cross-examination about the bloodstained clothing, and Washington later testified that the blood on the hooded sweatshirt had come from a car accident. WPD Detective Heather Bachman testified that the blood on the shoes came from the car accident.

The jury convicted Ransom on all counts.

Ransom filed a motion for new trial, arguing that the district court's refusal to remove Prospective Juror C for cause led the members of his jury to believe that they did not have to presume his innocence. The district court overruled Ransom's motion, ruling that Instruction Nos. 1 and 10 would have cured any misconception. Jury Instruction No. 1 stated in relevant part:

"In your fact finding you should consider and weigh everything admitted into evidence. This includes testimony of witnesses, admission or stipulations of the parties, and any admitted exhibits. You must disregard any testimony or exhibit which I did not admit into evidence.

. . . .

"Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded.

. . . .

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty."

Jury Instruction No. 10 stated in part: "Your verdict must be founded entirely upon the evidence admitted and the law as given in these instructions."

### Motion to Suppress

Regarding his motion to suppress, Ransom first argues that the search was unlawful because Washington never consented to it. In the alternative, Ransom asserts that, even if this court determines Washington consented, her consent was neither knowing nor voluntary because several detectives and officers surrounded her

house; she was placed in a patrol car; it was cold; she was pregnant; and she needed to use the bathroom.

The State responds that this court must give deference to the district court's decision and refrain from reweighing witness credibility. The State also contends that Ransom's alternative argument challenging the voluntariness of Washington's consent is inconsistent with Washington's testimony that she never consented to a search. The State also argues that Washington's consent was voluntary. In the State's view, officers asked Washington to sit in the police car only because of the bad weather, and it would have been more coercive to force her to remain outside; the number of law enforcement officers at the house was necessary for safety, and Washington spoke with only two officers in the car; Washington's pregnancy did not prevent her from making voluntary decisions; and Washington did not request to use the bathroom until after the search.

This court has long held that "[w]hen reviewing a motion to suppress evidence, an appellate court determines whether the factual underpinnings of the district judge's decision are supported by substantial competent evidence. The ultimate legal conclusion to be drawn from those facts raises a question of law requiring application of a de novo standard." *State v. Fitzgerald,* 286 Kan. 1124, 1126, 192 P.3d 171 (2008). An appellate court does not weigh evidence to find facts. See *State v. Fewell,* 286 Kan. 370, Syl. ¶ 2, 184 P.3d 903 (2008). In addition, "[t]he State has the burden of establishing the scope and voluntariness of the consent to search. These questions present issues of fact" that appellate courts review for substantial competent evidence to support them. *State v. Thompson,* 284 Kan. 763, 776, 166 P.3d 1015 (2007). "Substantial evidence is evidence that possesses both relevance and substance and that furnishes a substantial basis of fact from which the issues can reasonably be resolved. [Citation omitted.]" *Wilkins v. State,* 286 Kan. 971, 980, 190 P.3d 957 (2008).

A warrantless search is per se unreasonable under the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights unless it falls within a recognized exception to the search warrant requirement, such as consent. *Fitz-*

*gerald*, 286 Kan. at 1126-27. "For a consent to search to be valid, two conditions must be met: (1) There must be clear and positive testimony that consent was unequivocal, specific, and freely given and (2) the consent must have been given without duress or coercion, express or implied. [Citations omitted.]" *Thompson*, 284 Kan. at 776.

Here, substantial competent evidence supports the district court's factual findings that Washington expressly consented to the search of the house and that her consent was voluntary.

On the existence of an express consent, two officers testified that Washington consented to the search. According to their testimony, Washington's first statement of consent to one officer was confirmed soon after by another. Although Washington contradicted the officers on this point, the district judge made an explicit credibility judgment we are neither equipped nor authorized to make. He regarded the officers' version of events as the reliable one and discounted Washington's.

Once the district judge's credibility assessment judgment was made, the question became whether the consent was voluntary — whether it was "freely given," and "without duress or coercion, express or implied." See *Thompson*, 284 Kan. at 776. The State is correct that Washington never testified that she was compelled to consent to the house search. She insisted there was no consent, period. But the nature of her testimony did not preclude counsel's argument that any consent about which the officers testified was inadequate as matter of law. It is at least theoretically possible that circumstances existed or police tactics were employed that coerced Washington's cooperation in a way she did not appreciate and would not be able to describe. Many witnesses are not sophisticated, and most are not learned in the law.

Unfortunately for Ransom, the record as a whole does not support his counsel's effort. Although there were several officers at the scene, most of them had no role in the questioning in the car. The officers' decision to converse with Washington in the relative shelter and warmth of the car was sensible, perhaps even merciful. According to dates and other information from Washington's testimony, she could have been only 1 or 2 months into her pregnancy

at the time. This was long before her condition would have been obvious to the police. She never testified that she informed the police of her condition or its presumed effect on the urgency of her need to use the bathroom. Indeed, she did not testify that such an effect existed in her particular case, and the officers never testified even to knowledge of Washington's pregnancy. In short, this simply was not a situation in which the officers callously disregarded the needs of a woman whose advanced pregnancy demanded a quick resolution of their interaction so that she could arrive at a bathroom before it was too late.

Ransom next argues that the house search was unlawful because he was not provided an opportunity to refuse consent. The State contends that the officers were not required to solicit Ransom's views once they had Washington's voluntary consent. The State also argues that Washington had been untruthful about whether she lived alone and who was in the house at the time.

Both parties cite *Georgia v. Randolph*, 547 U.S. 103, 164 L. Ed. 2d 208, 126 S. Ct. 1515 (2006), to support their positions. *Randolph* involved a domestic disturbance. Janet Randolph informed police officers that they could find evidence of her husband's drug abuse in the house the couple shared. A sergeant asked the husband, Scott, for his permission to search the house. He refused it. The sergeant then asked Janet for her permission. She consented. The ensuing search uncovered evidence of drug use, and the State charged Scott with possession of cocaine. Scott filed a motion to suppress, arguing that the search was unlawful because he had expressly refused to consent to it.

The United States Supreme Court ruled in Scott's favor, holding that one resident's consent does not "prevail over the express wishes of another." 547 U.S. at 114. Under *Randolph*, law enforcement officers may not lawfully search a house if one resident consents but another who is present expressly refuses. 547 U.S. at 114-17, 121-23. The *Randolph* holding was qualified, however. It stated that it did not affect cases in which a defendant was not on the premises or did not expressly object to a search:

"[W]e are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice

for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.

" . . . So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it. . . . There is no ready reason to believe that efforts to invite a refusal would make a difference in many cases, whereas every co-tenant consent case would turn into a test about the adequacy of the police's efforts to consult with a potential objector." 547 U.S. at 121-22.

Several courts have since distinguished *Randolph*, including a panel of our Court of Appeals in *State v. Chilson*, 38 Kan. App. 2d 338, 165 P.3d 304 (2007). Defendant Jared Chilson lived with his father, Robert. Robert discovered marijuana in Jared's room and called the police. Officers arrived at the scene, designated by the dispatcher as a "domestic disturbance," and separated Robert and Jared, as they did in all domestic disputes. Robert informed officers that he flushed the marijuana down the toilet. The officers then asked Robert for his permission to search the house. Robert consented, and the officers discovered two or three fragments of marijuana in the toilet. The officers never asked Jared for his consent to search.

Jared filed a motion to suppress, which the district judge granted. Evaluating *Randolph*, the district judge ruled that it would not have been unreasonable to ask Jared for his consent or to obtain a search warrant based on Robert's statements; thus the search was unlawful.

The State appealed, and the Court of Appeals reversed, stating:

"The prohibition [against warrantless searches of a home] does not apply . . . to situations in which voluntary consent has been obtained, either from the individual whose property is searched [citation omitted], or from a third party who possesses [citation omitted], or who reasonably appears to possess [citation omitted], common authority over the premises. [Citations omitted.]

"In [*United States v.*] *Matlock*, [415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974),] the defendant, a suspect in a bank robbery, was arrested in the yard of a house where he lived with a woman named Gayle Graff and her relatives. Defendant was detained in a squad car while officers went to the door. Graff answered the door, dressed in a robe with a baby in her arms, and consented to a

search of the house. 415 U.S. at 166. When defendant contested the trial court's denial of his motion to suppress evidence discovered during the search, the Court held that 'the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.' 415 U.S. at 170.

"The Court reiterated and clarified this tenet in [*Illinois v.*] *Rodriguez*[, 497 U.S. 177, 111 L. Ed. 2d 148, 110 S. Ct. 2793 (1990)]. There, the defendant had severely beaten his girlfriend. She called police from her mother's home and took police to the defendant's apartment. She told them that she lived there with him, unlocked the door with a key, and gave them permission to enter. Police discovered the defendant asleep in a bedroom and seized drug evidence which formed in part the basis for the defendant's charges. Unbeknownst to the police, the girlfriend had in fact moved out of the apartment several weeks earlier and did not have actual authority to consent to the search of the defendant's apartment. 497 U.S. at 179-80. The Supreme Court nonetheless held the warrantless entry would be valid if police, at the time of entry, reasonably believed the girlfriend had common authority over the premises-objective reasonableness being the critical inquiry. 497 U.S. at 188-89.

"Kansas has absorbed the holdings of *Matlock* and *Rodriguez* and adopted the third-party consent to search exception to the warrant requirement. [Citations omitted.] . . .

. . . .

"The facts of this case[, however,] fall somewhere along the continuum of reasonableness established by *Matlock* and *Randolph*. Here, the co-occupant defendant was not absent, as was the defendant in *Matlock*. But, unlike the co-occupant defendant in *Randolph*, he did not stand at the door and object to the search. However, the district court did not find the officers removed the defendant 'for the sake of avoiding a possible objection'; rather, they removed him pursuant to protocol. Nor did the evidence indicate the defendant voiced an objection despite the officers' failure to inquire. Moreover, if the defendant had been asked for his consent to search, it is not a foregone conclusion that he would have refused: suspects often consent, albeit imprudently. [Citations omitted.]

"In determining where this case falls on the continuum, we find guidance in recent post-*Randolph* cases from other jurisdictions with similar factual circumstances.

"For instance, in *United States v. DiModica*, 468 F.3d 495, 497-98 (7th Cir. 2006), a wife, who was not present at the home, reported a domestic assault and told police her husband, DiModica, was a felon who possessed guns and drugs. She gave police a key to their house and consent to search. Armed with an arrest warrant, officers knocked on the door, confirmed DiModica's identity, arrested him, and removed him from the home. They did not ask his permission to search. The wife met officers at the home afterward, and police discovered items that formed the basis of charges unrelated to the domestic abuse. DiModica argued that had he not been arrested and removed from the scene, he would have refused

to allow the police to search his home. The Seventh Circuit [Court of Appeals] distinguished the case from *Randolph*, noting that unlike the defendant and his wife in *Randolph*, DiModica and his wife were not standing together at the doorway, one consenting to the search while the other refused. The officers did not ask DiModica for permission to search, and DiModica did not advise the officers they could not do so.

"The Seventh Circuit found DiModica's case was not materially distinguishable from *Matlock*. The officers did not remove DiModica to avoid his objection; they legally arrested DiModica based on probable cause he had committed domestic abuse. Once DiModica was arrested and removed from the scene, the wife's consent alone was valid and permitted the officers to legally search the residence. See also *United States v. Wilburn*, 473 F.3d 742 (7th Cir. 2007) (no Fourth Amendment violation where officers, after arresting defendant and placing him in squad car outside his apartment, received consent from defendant's girlfriend to search apartment where defendant lived with girlfriend; defendant was not physically present when girlfriend consented to search, made no objection, and officers had not deliberately removed him from area to avoid hearing him invoke objection to the search); *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006) (where there was no evidence that the defendant was asked for consent to search and refused, or that he objected in any way, court distinguished case from *Randolph*).

"Similarly, in *United States v. Uscanga-Ramirez*, 475 F.3d 1024 (8th Cir. 2007), officers responded to a mother's report that her son-in-law was holding her daughter against her will in their home. Police arrived at the residence and found the mother sitting in a parked car in front of the home. The daughter then walked out the front door. In response to police questions, the daughter said she was not being held against her will; she was leaving with her mother; her husband had locked himself in a bedroom with a gun because he was upset that she was leaving; but he had not threatened to harm anyone, including himself. The police asked for her permission to enter the residence and check on her husband, and she consented. Officers found the locked bedroom and the husband opened the door. He advised officers he didn't have a gun, but police discovered a loaded gun under a pillow in the middle of the bed. He was charged with being an illegal alien in possession of a firearm and ammunition.

"The Eighth Circuit [Court of Appeals] in *Uscanga-Ramirez* distinguished *Randolph* based upon the lack of any evidence that defendant expressly refused the officers' entry into the home.

"Federal district courts and other state courts also have concluded that absent a defendant co-occupant's express objection, third-party consent to a search is a valid exception to the warrant requirement. See, *e.g.*, *United States v. Church*, 2007 WL 689890, at 2 (W.D. Mich. 2007) [unpublished opinion] (*Randolph* distinguishable where present defendant raised no objection to entry, which co-occupant girlfriend invited); *United States v. Groves*, 2007 WL 171916, at 6 (N.D. Ind. 2007) [unpublished opinion] (defendant refused to consent to search on night

shots fired from his house; police returned 2 weeks later and obtained consent from defendant's live-in girlfriend who had actual and apparent authority to consent; court held police did not procure defendant's absence and his earlier objection was insufficient to invalidate girlfriend's later consent); *United States v. McCurdy*, 480 F. Supp. 2d 380, 390 n. 9 (D. Me. 2007) (*Randolph's* holding expressly limited to defendants who are physically present and expressly refuse consent; it does not extend to absent but potentially reachable defendants who, if reached, might refuse consent); *Starks v. State*, 846 N.E.2d 673, 682 n. 1 (Ind. App. 2006) (*Randolph* distinguishable where, when co-tenant consented, defendant was not physically present, and was physically present for another portion of search but did not express refusal to consent to the search); but see *United States v. Henderson*, 2006 WL 3469538 (N.D. Ill. 2006) [unpublished opinion] (wife gave officers responding to her domestic battery call a house key; they entered home she shared with defendant, who told officers to 'get the fuck out of my house'; officers acted unreasonably under *Randolph* in removing defendant and searching home based on wife's consent given defendant's explicit objection).

"As the Utah Court of Appeals noted in *State v. Udell*, 141 P.3d 612, 613 (Utah App. 2006), *Randolph* ' "invites a straightforward application of the rule that a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." '

"Here, in the absence of evidence that Chilson expressly objected to the search, or that officers specifically removed him from the home 'for the sake of avoiding a possible objection,' we hold the consent given by the defendant's father satisfied the consent exception to the Fourth Amendment's prohibition against warrantless searches and seizures. We believe our decision is consistent with *Matlock* and *Rodriguez* and, under these facts, does not offend the holding in *Randolph*." *Chilson*, 38 Kan. App. 2d at 341-47.

We approve of the Court of Appeals' analysis and application of *Randolph* in *Chilson*. Moreover, we are guided by it in reaching a conclusion here.

Certainly, law enforcement officers are not free to ignore a resident's refusal of consent to search a dwelling and then seek a more welcoming response elsewhere, and they are not free to manipulate an uncooperative or potentially uncooperative resident's presence or absence to silence him or her. But officers are not required to seek out consent or refusal of another resident once one resident's voluntary consent has been obtained.

In this case, we see no evidence that Ransom expressly objected to the search or that officers removed him from the house for the sake of avoiding a possible objection. In fact, they initially seated

Ransom on a couch inside the house. He was free to speak up about his occupancy and to prevent or stop the search. It is important to remember that the police already had a voluntary consent from Washington, who had denied that anyone lived in the house with her. At the time the police searched pursuant to her consent, there was no reason for them to believe they needed to consult Ransom.

Because the State prevails on its arguments that Washington consented, that her consent was voluntary, and that provision of an opportunity for Ransom to refuse consent was not necessary, we hold that the district judge's disposition of Ransom's motion to suppress was correct. Washington's consent satisfied any Fourth Amendment concern.

In closing our discussion of this issue, we need not fully address the State's additional assertion of the inevitable discovery doctrine to save the search. The applicability of the doctrine here is questionable; Washington's admission that there was marijuana in the house may have made an application for a search warrant inevitable, but it did not make the granting of a warrant from a neutral and detached magistrate a foregone conclusion.

### Admission of Evidence Regarding Bloodstained Clothes and Air Gun

During trial, Ransom objected to the admission of evidence about the bloodstained clothes and the air gun, arguing that such evidence was derived from an unlawful search. Now Ransom argues that this evidence was irrelevant and highly prejudicial because neither the clothes nor the air gun was connected to the charged crimes. Ransom acknowledges that he did not object on relevance or undue prejudice at trial.

The State argues first that Ransom failed to preserve this issue for appeal. It also asserts that Ransom invited any error on admission of evidence about the clothes because his counsel asked several questions about them on cross-examination. In addition, the State maintains the clothes were relevant to connect Ransom to Washington's house. The State also argues that evidence about the clothes was not prejudicial because the State readily admitted they

were connected to the car accident rather than the homicides or attempted aggravated robberies before the jury. Finally, the State asserts that Ransom has failed to support his claim that evidence about the air gun was irrelevant or prejudicial.

A party may not object at trial to the admission of evidence on one ground and then argue a different ground on appeal. *State v. Engelhardt*, 280 Kan. 113, 127, 119 P.3d 1148 (2005). Regardless of this rule, Ransom's arguments on this issue would not merit reversal.

Relevant evidence is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). The concept encompasses both the existence of probative value and materiality. See *State v. Vasquez*, 287 Kan. 40, 50, 194 P.3d 563 (2008); *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008). The standard of review on whether evidence is probative in a particular case is abuse of discretion, and the standard of review on whether evidence is material is de novo. *Reid*, 286 Kan. at 507-09. If error has occurred in a district court ruling on the admissibility of evidence, that error must be further evaluated for harmlessness. See *State v. Gonzalez*, 282 Kan. 73, 99-100, 145 P.3d 18 (2006). "Reversal is required only where an erroneous admission of evidence is of such a nature as to affect the outcome of the trial and deny substantial justice." *State v. Garcia*, 282 Kan. 252, 270, 144 P.3d 684 (2006); see also K.S.A. 60-261 (reversal required only if refusal to reverse inconsistent with substantial justice).

The evidence regarding the bloodstained clothes found in Washington's house was neither irrelevant nor unduly prejudicial. The State is correct that the clothes connected Ransom to Washington's house, where evidence of the charged crimes was found. Although the evidence about the air gun was not probative or material, neither was it unduly prejudicial. It constituted a speck of debris in an otherwise clean and clear case against Ransom. We are confident its admission was not inconsistent with substantial justice; it did not affect Ransom's substantial rights; and there is no likelihood that it affected the outcome of the trial.

### Refusal to Strike Jury Panel Member for Cause

Ransom's last argument is that the district judge's refusal to remove Prospective Juror C for cause "improperly [led] the jury

panel . . . to believe that [Ransom] was not entitled to the presumption of innocence." He does not accept the district judge's belief or the State's insistence that Instruction Nos. 1 and 10 cured any potential problem.

The State also responds that the district judge did not abuse his discretion in refusing to remove Prospective Juror C for cause because: The panel member never stated that she could not follow the presumption; "the district court clearly stressed the importance of the presumption to all the prospective jurors"; Ransom's counsel, during a posttrial hearing, stated that he was not unhappy with the jury; and Prospective Juror C did not ultimately sit on the jury.

The parties disagree on the applicable standard of review. Ransom urges us to employ a de novo review on a ruling he regards as a question of law. The State contends that we may not disturb a district judge's determination that a prospective juror is qualified to sit unless the judge has abused his or her discretion.

The State is correct. This court has long held that a "[district] judge is in a better position than an appellate court to view the demeanor of prospective jurors as they are questioned"; thus, appellate courts review decisions on challenges for cause under an abuse of discretion standard. *State v. Franklin*, 280 Kan. 337, 346, 121 P.3d 447 (2005). Judicial discretion is abused if judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by a district judge, then it cannot be said that the judge abused his or her discretion. *State v. Reed*, 282 Kan. 272, 280, 144 P.3d 677 (2006). The party asserting abuse of discretion bears the burden of showing it. *State v. Brown*, 285 Kan. 261, 303, 173 P.3d 612 (2007). Also, "[t]he failure to excuse a juror for cause is not a ground for reversal unless the defendant was prejudiced as a result." *Franklin*, 280 Kan. at 346.

Ransom has not demonstrated an abuse of the district judge's discretion in refusing to remove Prospective Juror C for cause. Prospective Juror C did not say that she would be unable to presume Ransom was innocent; she merely acknowledged difficulty in doing so. The judge removed two other jurors for cause because they went farther than Prospective Juror C; they stated they could

not presume Ransom was innocent. Moreover, the district judge instructed the jurors who actually were selected from the venire that "[they] must presume that [Ransom] is not guilty unless [they] are convinced from the evidence that he is guilty." We are skeptical that the district judge's refusal to strike Prospective Juror C for cause could have caused any misunderstanding of the presumption of innocence among Ransom's eventual jury. But, even if we are wrong about that, the judge's other strikes and instructions would have remedied any problem.

Affirmed.