IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 126,819


STATE OF KANSAS,
*Appellee*,

v.

URAQUIO ARREDONDO,
*Appellant*.


SYLLABUS BY THE COURT


1.

The Fourth Amendment to the United States Constitution protects against unreasonable searches, which may include entry into homes by law enforcement.


2.

A warrantless search may conform with Fourth Amendment requirements if consent is given to law enforcement to enter a home.


3.

Voluntary consent consists of two parts: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given.


4.

A police officer armed with probable cause to believe a home contains evidence of a serious crime that might otherwise be destroyed may lawfully secure the home and restrict entry while waiting for an assisting officer to diligently procure a search warrant.


1

Appeal from Grant District Court; CLINT PETERSON, judge. Oral argument held May 14, 2025. Opinion filed July 3, 2025. Affirmed.

*Peter T. Maharry*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Ethan C. Zipf-Sigler*, assistant solicitor general, argued the cause, and *Kris W. Kobach*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.:  A judge found Uraquio Arredondo guilty of one count of felony child abuse and one count of felony murder in the death of the son of his domestic partner. He appeals that verdict.

C.V. was three years old in February 2019. His parents split up in 2018, and his father remained in Salina, while his mother, Diana Garcia, moved to Ulysses. She began a relationship with Arredondo, and the two shared a residence in Ulysses, where she had primary custody of C.V. Garcia worked at a Casey's General Store in Ulysses.

On the morning of February 26, 2019, Garcia went to work. A few hours later she took a break and dropped Arredondo off at his work and then took C.V. to his daycare center. She then went back to work and finished her shift at 1:00 in the afternoon. She returned to the Casey's with C.V. around 2:00 p.m. to pick up a snack for C.V. During this time, the child was behaving normally. Back home, Garcia started preparing a dinner of pork chops and noodles. She then took C.V. with her and picked Arredondo up from work. C.V. was still behaving normally. Around 4:00 p.m., Garcia told Arredondo she was going to work out with his sister, and she left him with C.V. at the home.

About an hour and a half later, a neighbor called the sister's home and reported that C.V. had been in an accident, and Garcia immediately rushed back to the residence. Meanwhile, at 5:34 p.m., Arredondo called 911 using a neighbor's phone. Emergency services and police showed up at Arredondo's residence and found C.V. not breathing and without a pulse. The child was taken to the hospital with no respiration and bruising across his body, some of which was in various stages of healing. He was flown to a hospital in Denver, where he was pronounced dead.

While the medical teams were attempting to resuscitate C.V. at the Ulysses hospital, Arredondo eventually went to the hospital, where Special Agent LaRue of the Kansas Bureau of Investigation asked Arredondo if they could speak privately. Arredondo told LaRue that C.V. had just come back from the store with his mother and was talking to Arredondo when he suddenly stopped speaking. According to Arredondo, the child was eating pasta with pieces of pork chops in it. Arredondo said he knew the child was choking, and Arredondo began to try backward compressions.

Meanwhile, law enforcement had secured the residence to make sure that no one entered it without a police escort. At the conclusion of the interview, LaRue asked Arredondo whether he would give law enforcement permission to search the residence or whether they would need to obtain a warrant. Arredondo told him to "go ahead and take the damn pictures." Arredondo then left with his sister, who drove him back to the residence.

On the ride there, Arredondo elaborated on the events leading to C.V.'s death. He told his sister that he went to the bathroom and then sat down at the kitchen table. He saw C.V. making a motion as if he were choking. Arredondo attempted to perform a Heimlich maneuver and then put him in the bathtub and ran cold water on him, hoping that would

3

revive him. After again attempting CPR, Arredondo ran to several neighbors' houses for help, and one of them finally answered the door.

Several law enforcement officers met Arredondo at the residence when his sister dropped him off. He signed a consent to search the residence, and officers asked him to reenact the events leading up to the medical crisis. The officers recorded him performing the reenactment in the residence.

Dr. James Caruso, the Chief Medical Examiner and Coroner for the City and County of Denver, performed an autopsy on C.V. He concluded the child died as a "result of multiple blunt force injuries particularly to the head." He discovered injuries to C.V.'s brain, including bleeding around the brain, and a fractured skull. He determined the fracture was fresh and had occurred close to the time of death, which could have meant as much as a day or two or as little as mere hours. He also found external injuries on C.V.'s torso and about a liter of blood in his peritoneal cavity, which would amount to about a third of the child's total blood supply. He conceded that such internal injuries could have resulted from attempts to induce cardiopulmonary resuscitation. He saw no evidence of any other contributory causes to the death of C.V., such as disease, chemical poisoning, or choking.

Dr. Ahmed Gilani, a pediatric neuropathologist at the University of Colorado, conducted a more detailed examination of the brain injuries. As the district court judge observed when explaining his verdict, Dr. Gilani's testimony is challenging for laypeople to understand, but he concluded that C.V. suffered from severe and traumatic brain injuries. He believed there were at least two separate incidents causing damage to the child's brain, one from between three and seven days before the death and another less than 24 hours before the time of death. Like Dr. Caruso, he found no evidence of disease or other causes of death.

The daycare provider, Ana Ponce, testified that on C.V.'s last day in daycare he was unusually quiet. He had marks that looked like he had been hit in his low back and midsection. She testified that when C.V. was asked what happened to his back, C.V. whispered to Ponce's daughter, "My Rocky did," Rocky being Arredondo's nickname. C.V.'s father testified the child had spent some time visiting him in Salina not long before the death. He testified the child behaved normally and playfully during most of the visit, but he acted scared when it became time to drive him back to Ulysses. The father saw unusual bruises on C.V. and asked how he got them. C.V. responded, "Rocky and mommy owwies pow pows." The father explained that "owwies" meant bumps and scrapes, while "pow pows" referred to hitting.

Arredondo was charged with one count of felony murder, with child abuse as the underlying felony, and one count of child abuse. He chose to forego a jury trial and was tried to the court. The judge found Arredondo guilty of both felony murder and child abuse under K.S.A. 21-5602. The judge imposed a hard 25 life sentence for the murder count and a consecutive upward durational departure sentence of 110 months for the child abuse count.

*The Searches of Arredondo's Residence*

Law enforcement officers walked through Arredondo's residence three times, twice when they responded to the initial emergency call and then a third time after they talked with him at the hospital. The visits revealed information that tended to undermine the version of events that Arredondo gave to others, including law enforcement, especially relating to the absence of any indication that C.V. had eaten any supper and evidence from the bathroom showing a broken toilet seat had been replaced. Arredondo maintains that the second and third times police officers entered his residence constituted

searches made without his valid consent and the evidence resulting from the visits should have been suppressed.

When reviewing a ruling on a motion to suppress the admission of evidence, an appellate court generally reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence and reviews the ultimate legal conclusion de novo. *State v. Cash*, 313 Kan. 121, 125-26, 483 P.3d 1047 (2021).

The Fourth Amendment to the United States Constitution protects against unreasonable searches, which may include entry into homes by law enforcement. Warrantless searches are per se unreasonable under the Fourth Amendment unless they fall within a recognized exception to the search warrant requirement. See *Payton v. New York,* 445 U.S. 573, 582 n. 17, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State v. Ransom*, 289 Kan. 373, 380, 212 P.3d 203 (2009). Voluntary consent to search is one exception to the requirement of judicial approval. See *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Voluntary consent consists of two parts: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given. See *Florida v. Royer,* 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *State v. Daino*, 312 Kan. 390, 402-03, 475 P.3d 354 (2020). When determining the voluntariness of consent, the Fourth Amendment requires that "a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion [i]s applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Schneckloth,* 412 U.S. at 228.

All three times that officers entered Arredondo's residence they did so without obtaining search warrants. Arredondo contends the second and third searches were

6

unlawful and the evidence obtained—both the testimony of the officers and the photographs and video recordings they made—should have been suppressed.

## A. The Initial Search

Officer Jason Brown entered the residence responding to the emergency call. He entered the home and attempted to administer CPR. His presence in the home was recorded on his bodycam, and the recording was admitted into evidence.

Arredondo did not object to the admission of this evidence or seek to suppress it, and he does not challenge its admissibility on appeal. The evidence obtained from this search was largely redundant with the evidence obtained in the second and third searches.

## B. The Second Search

When they arrived at Arredondo's residence, law enforcement officers spoke with him after EMT personnel put C.V. in the ambulance. The encounter was recorded by bodycam video and was introduced at trial. Detective Carlos Salinas asked Arredondo if he could show him "where it happened." Salinas pointed to the residence and started walking in that direction. Arredondo was talking with the officers, and they followed him in as he opened the door for them and started to show them around the residence and explained what had happened.

Arredondo argues that he did not give consent to the search and that the circumstances indicated that he was coerced into allowing the officers into his home:  any reasonable person would have understood that he was being ordered to allow them into his home.

The trial judge held that the search was consensual. The judge stated,

"[H]e walked in and invited the police officers to follow him. It's also important to point out that the officer did not direct the defendant to show him but formed in the terms of a question, can you show me where it happened, it's an invitation extended by the Defendant to enter the house to see those—well for—where the events occurred."

We have reviewed the video recording and the testimony relating to its introduction. Keeping in mind the *Royer* test for voluntary consent—(1) the law enforcement officers must receive either express or implied consent, and (2) consent must be freely and voluntarily given—we conclude, as did the trial judge, that Arredondo voluntarily consented for the police to accompany him into the residence. They did not threaten him, they did not demand permission to enter, and he opened the door for them as he was talking with them.

In *Daino*, 312 Kan. at 402-03, this court noted that nonverbal conduct can constitute valid consent to enter. The court pointed to decisions upholding the entry in light of such conduct as opening a door and stepping back, nodding in the affirmative or waving officers in, and stepping back and allowing officers in after they asked permission to enter. Under the circumstances of this case, Arredondo's conduct indicated an unambiguous consent for the officers to enter his home.

Although the police did not tell Arredondo that he was free to say no, that does not weigh against voluntariness. See *Ohio v. Robinette,* 519 U.S. 33, 39-40, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996) (officers do not have to expressly inform suspects they are free to go before requesting permission to conduct a search).

8

The factual findings by the trial judge are supported by the video recording, supporting the legal conclusion that Arredondo consented to the search and the consent was voluntary.

C.  The Third Search

While Arredondo was at the hospital, law enforcement secured the premises and would not allow anyone, including Arredondo, to enter the residence. After Arredondo and police returned from the hospital, they asked him to sign a form consenting to a search, which he did. He now argues that a seizure was already completed by police even before he arrived back home because the police had secured the residence against entry.

A police officer armed with probable cause to believe a home contains evidence of a serious crime that might otherwise be destroyed may lawfully secure the home and restrict entry while waiting for an assisting officer to diligently procure a search warrant. *Illinois v. McArthur*, 531 U.S. 326, 333-34, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001); *Segura v. United States*, 468 U.S. 796, 798, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984).

Arredondo argues on appeal there was no probable cause to support securing the premises. He states that law enforcement had nothing more to work with at that time than an emergency call for help. But there was ample evidence supporting a determination that a crime had occurred:  the child had extensive bruising, and the visual impressions from the earlier visits to the residence indicated Arredondo was lying when he told police the child had been eating noodles and begun to choke. The police would have seen the discrepancy between Arredondo's account of the events and the actual situation in the dining area when they were first in the residence—there was no sign of a meal in progress or that food had been taken from the stovetop. Securing the premises against disturbing potential evidence of a crime was proper in this case.

9

Arredondo signed a consent form giving law enforcement officers permission to conduct the third search. He contends this consent was coerced because the police had already secured the residence and were not going to allow him to enter without supervision. As we have concluded, the police had lawfully locked down the residence because of the evidence that a crime had been committed there. Arredondo had a choice: he could wait outside while the police attempted to obtain a search warrant, or he could allow police to accompany him into the residence. He chose the latter.

Although the lockdown may have factored into his choice, that does not make the lockdown unlawful or unduly coercive. We see nothing in the testimony of the parties involved or in the recordings of the search suggesting that law enforcement intimidated him, threatened him, or misled him to obtain permission to go inside. Once inside the residence, Arredondo freely talked with officers and walked with them as he showed them his version of what happened.

The evidence supports the trial judge's decision that Arredondo voluntarily consented to allow the third entry and search. We find no error in admitting the evidence obtained in the course of this search.

*Arredondo's Statements to Law Enforcement*

Arredondo contends the district court should have suppressed and not considered statements he made to law enforcement, both at the immediate time of the incident and later during the investigation of the death. He argues the statements were made without law enforcement informing him of his *Miranda* protections, they were made in a custodial context, and they were involuntary.

10

Before we are able to address these arguments on their merits, however, we must consider whether they were preserved for appeal. As a procedural bar to appellate review, K.S.A. 60-404 requires a party to make a contemporaneous objection to issues involving the erroneous admission or exclusion of evidence. *State v. Hillard*, 313 Kan. 830, 839, 491 P.3d 1223 (2021).

Although Arredondo did not object to the admission of any of his statements to law enforcement officers, he maintains he was not required to do so to preserve the issue. He cites to *State v. Spagnola*, 295 Kan. 1098, 1103, 289 P.3d 68 (2012), where this court held a party is not required to object at trial to preserve for review a suppression issue under certain conditions. The court specifically held that where the judge conducted hearings on two motions to suppress evidence, where the same judge conducted the trial as conducted the suppression hearing or hearings, where the trial was to the court, and where the judge told the parties he understood that any future objections would be based on the ruling on the suppression issue, the contemporaneous objection requirement was satisfied. *Spagnola*, 295 Kan. at 1103.

While we have recognized the existence of a contemporaneous objection in these limited circumstances, those circumstances are not present here. We have not abandoned the requirement of a clear and identifiable objection. In the present case, Arredondo did not file a motion to suppress; he instead argued against the State's motion to introduce the statements, but he later signed a stipulation to both the foundation and the admissibility of the statements. He at no time objected to the admission of the evidence. To the contrary, when the judge specifically asked him whether he had any objection to the admission of the first interview at the police station, he said no. Arredondo gave the trial court no indication that he opposed the court's consideration of any of the statements he made to law enforcement.

Because he did not put the trial court on notice that he was maintaining a position that the statements were inadmissible, we find the issue has not been preserved for appellate review.

*Cumulative Error*

Finally, Arredondo argues that trial errors accumulated to prejudice his defense. Having found no trial errors, we find no cumulative error. See *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021) (cumulative error rule does not apply if there are no errors or only a single error).

CONCLUSION

Finding no error in the issues that Arredondo raises, we affirm his convictions.

Affirmed.

WILSON, J., not participating.