(242 P.3d 223)
No. 102,342

STATE OF KANSAS, *Appellee*, v. JOSEPH MORALEZ, *Appellant*.

Opinion filed November 24, 2010.

*Michael J. Bartee*, of Michael J. Bartee, P.A., of Olathe, for appellant.

*Chadwick J. Taylor*, district attorney, *Natalie Chalmers*, assistant district attorney, and *Steve Six*, attorney general, for appellee.

Before MALONE, P.J., HILL and ATCHESON, JJ.

MALONE, J.: Joseph Moralez appeals his conviction of possession or control of a hallucinogenic drug. Moralez claims the district court erred by denying his motion to suppress the evidence. Specifically, Moralez claims that he was unlawfully seized by law enforcement officers and that the discovery of an outstanding warrant did not purge the taint of the unlawful police conduct. We conclude that even if Moralez was unlawfully detained by the law enforcement officers, the subsequent good-faith discovery of the arrest warrant purged the taint of the unlawful conduct and justified the search incident to the arrest.

On August 25, 2007, at 2:48 a.m., Topeka Police Officer Damon Whisman was on routine patrol when he noticed a parked vehicle with its lights on and he stopped to investigate. Whisman discov-

ered that the vehicle had an expired 30-day tag. Officer Mark Hilt arrived at the scene shortly thereafter in a separate vehicle. While Whisman and Hilt were looking at the parked vehicle, Moralez came out onto a second-floor balcony of a nearby apartment and asked the officers what they were doing. Whisman asked Moralez if the vehicle belonged to him. Moralez tried to discuss the vehicle with Whisman from the balcony, but eventually Moralez came down to the parking lot because he and Whisman were having a hard time hearing.

In the parking lot, Whisman asked Moralez who owned the vehicle, and Moralez said the owner was Melody Legate, who was upstairs in the apartment. Moralez testified that he offered to get Legate, but the officers asked him not to go anywhere. Whisman denied that the officers asked Moralez to stay. In any event, Moralez testified that he felt free to leave, regardless of the officers' request that he stay. Whisman also testified that he considered Moralez free to leave at that point, although he never conveyed this belief to Moralez.

Within a few minutes, Legate came down to the parking lot and discussed the expired tag with Whisman. Moralez was not part of this conversation but stayed close by. Whisman then asked Legate and Moralez to provide identification. Whisman testified that he asked Moralez for his identification just to document him as a witness. Whisman testified that if Moralez had denied his request for identification or had refused to give his name, there was nothing that he would have done. Moralez provided Whisman with a Kansas identification card, and Legate provided her Kansas driver's license.

For no stated reason, Whisman checked both identifications for warrants, and the dispatcher informed him that Moralez possibly had a county warrant. When Whisman found out there was a possible warrant on Moralez, he told him to "stay right there" until the warrant could be confirmed. Whisman testified it is his responsibility as a law enforcement officer to arrest any person who is the subject of a confirmed warrant. The dispatcher confirmed the warrant, and Whisman arrested Moralez at 3:04 a.m. Upon being arrested, Moralez indicated to Whisman that he had a bag

of marijuana in his right front pocket. Whisman searched Moralez incident to the arrest and seized the marijuana from his pocket.

The State charged Moralez with one count of possession or control of a hallucinogenic drug. Moralez filed a motion to suppress the marijuana and the statements he made in relation to the marijuana, claiming that the search violated his rights under the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights. After hearing testimony from Whisman and Moralez, the district court denied the motion to suppress. The district court found that the encounter between Moralez and the law enforcement officers was voluntary. The district court also found that even if Moralez was unlawfully detained, the subsequent discovery of the arrest warrant purged the taint of the unlawful detention because the officers' conduct was not flagrant.

The case proceeded to a bench trial, and Moralez renewed his objection to the admission of the evidence. The district court overruled the objection and found Moralez guilty as charged. The district court sentenced Moralez to 13 months' imprisonment, with probation and mandatory drug treatment. Moralez timely appealed his conviction.

On appeal, Moralez claims the district court erred by denying his motion to suppress the evidence. When reviewing the denial of a motion to suppress evidence, an appellate court reviews the factual findings underlying the district court's decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those factual findings by a de novo standard. The appellate court does not reweigh the evidence. *State v. Ransom*, 289 Kan. 373, 380, 212 P.3d 203 (2009).

Moralez makes two contentions on appeal. First, Moralez claims that his encounter with the law enforcement officers was an unlawful detention rather than a voluntary encounter. Second, Moralez claims that the discovery of the outstanding warrant during his unlawful detention did not purge the taint of the unlawful police conduct. We will examine these contentions in turn because if we conclude the encounter between Moralez and the officers was

voluntary, we do not need to address whether the discovery of the warrant purged the taint of unlawful police conduct.

## Moralez' Encounter with the Law Enforcement Officers

Moralez first claims that his encounter with the law enforcement officers was an unlawful detention rather than a voluntary encounter. Although Moralez testified that he felt free to leave, he argues that under the totality of the circumstances the conduct of the officers would not have conveyed to a reasonable person that he was free to end the encounter and leave.

We will begin by setting forth the applicable constitutional provisions. The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Section 15 of Kansas Constitution Bill of Rights contains similar language and "provides protections identical to that provided under the Fourth Amendment to the United States Constitution." *State v. Morris*, 276 Kan. 11, 17, 72 P.3d 570 (2003).

There are four types of police-citizen encounters. The first type is a voluntary encounter, which is not considered a seizure under the Fourth Amendment. *State v. Lee*, 283 Kan. 771, 774, 156 P.3d 1284 (2007). The second type is an investigatory detention or *Terry* stop, in which an officer may detain any person in a public place if the officer reasonably suspects that the person is committing, has committed, or is about to commit a crime. See K.S.A. 22-2402(1); *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The third type of encounter is a public safety stop, in which an officer may approach a person to check on his or her welfare when the officer can articulate specific facts indicating a concern for the public's safety. See *State v. Vistuba*, 251 Kan. 821, 824, 840 P.2d 511 (1992). The fourth type of encounter between law enforcement officers and citizens is an arrest. See K.S.A. 22-2401.

Courts have struggled with the delineation between a voluntary encounter and an investigatory detention. In a voluntary encounter, the citizen is always free to leave or terminate the encounter.

*State v. McKeown*, 249 Kan. 506, 509, 819 P.2d 644 (1991). "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). In a voluntary encounter, the officer can ask the individual's name and request identification but cannot force the individual to answer. *McKeown*, 249 Kan. at 509. A voluntary encounter is not considered a seizure and does not require the officer to have reasonable suspicion of criminal activity. *State v. Young*, 37 Kan. App. 2d 700, 704, 157 P.3d 644 (2007). Conversely, a person is seized when there is a show of authority which, in view of all the circumstances surrounding the incident, would communicate to a reasonable person that he or she is not free to leave and the person submits to the show of authority. *Morris*, 276 Kan. at 18-19. A seizure requires the officer to have reasonable suspicion of criminal activity. *Young*, 37 Kan. App. 2d at 704.

Law enforcement interaction with a citizen is consensual, not a seizure, if under the totality of the circumstances the officer's conduct conveys to a reasonable person that he or she is free to refuse the officer's requests or otherwise end the encounter. *State v. McGinnis*, 290 Kan. 547, Syl. ¶ 3, 223 P.3d 246 (2010). In applying the totality of the circumstances test in a Fourth Amendment context, no one factor is legally determinative, dispositive, or paramount. The outcome does not turn on the presence or absence of a single controlling or infallible touchstone and requires careful scrutiny of all the surrounding circumstances. 290 Kan. 547, Syl. ¶ 5. Because the determination of whether a reasonable person would feel free to terminate an encounter or refuse to answer questions is fact-driven, no list of factors can be exhaustive or exclusive. 290 Kan. 547, Syl. ¶ 6.

Under the test for determining whether a reasonable person would feel free to refuse an officer's requests or otherwise end a police-citizen encounter, an objective standard is applied. The citizen's subjective state of mind is not a relevant factor. *State v. Thompson*, 284 Kan. 763, 809-10, 166 P.3d 1015 (2007). Likewise,

the subjective intent of a law enforcement officer is relevant to an assessment of the officer's conduct only to the extent that such intent has been conveyed to the citizen. 284 Kan. at 807.

Returning to our facts, Moralez initiated his contact with the law enforcement officers. Whisman asked Moralez for his identification in order to document him as a witness. Whisman testified that if Moralez had denied his request for identification or had refused to give his name, there was nothing he would have done. These factors support a conclusion that the encounter was voluntary. On the other hand, Moralez points to the evidence that there were two officers involved, that they did not inform him of his right to end the encounter, and that they held his identification card while checking for outstanding warrants. These factors support a conclusion that under an objective standard, a reasonable person would not have felt free to refuse the officers' requests or otherwise end the encounter. If Moralez was being objectively detained by the officers under a show of authority, then the seizure was unlawful because the State concedes the officers had no reasonable suspicion that Moralez was involved in criminal activity.

In finding that the encounter was voluntary, the district court focused on Moralez' testimony that he felt free to leave, regardless of the officers' request that he stay. Indeed, Moralez testified repeatedly that he felt free to end the encounter and leave. However, the test for determining whether a police-citizen encounter is voluntary is an objective one, and Moralez' subjective state of mind is not a relevant factor. See *Thompson*, 284 Kan. at 809-10. Likewise, Whisman's subjective belief that Moralez was free to leave is not a relevant factor because Whisman never conveyed this belief to Moralez. See 284 Kan. at 807.

In analyzing the nature of the encounter between Moralez and the officers, the district court failed to make specific findings of fact. In this regard, there was one key factual dispute between Moralez' testimony and Whisman's testimony that was never resolved by the district court. Moralez testified that the officers asked him not to go anywhere as soon as he came down to the parking lot. Whisman denied that the officers asked Moralez to stay until after Whisman learned there was a possible warrant. The resolution

of this factual dispute may be critical in reaching the ultimate legal conclusion whether the encounter between Moralez and the officers was voluntary.

If the nature of the encounter between Moralez and the law enforcement officers was the only issue on appeal, we would remand the case to district court to make further findings of fact. However, the district court denied the motion to suppress on the alternative ground that even if Moralez was unlawfully detained, the subsequent discovery of the arrest warrant purged the taint of the unlawful detention. We will address that issue next.

## DISCOVERY OF THE ARREST WARRANT

Moralez claims that the discovery of the outstanding warrant did not purge the taint of the unlawful police conduct. For the purposes of our analysis of this issue, we will assume that at some point the encounter between Moralez and the law enforcement officers became an unlawful detention. The question then becomes whether the discovery of the arrest warrant purged the taint of the unlawful detention and justified the search incident to the arrest.

As we previously discussed, a few minutes into the encounter between Moralez and law enforcement officers, Whisman asked Moralez for his identification. Whisman testified that if Moralez had denied his request for identification or had refused to give his name, there was nothing that he would have done. Whisman checked the identification for warrants, and the dispatcher informed him that Moralez possibly had a county warrant. Whisman testified it is his responsibility as a law enforcement officer to arrest any person who is the subject of a confirmed warrant. When the warrant was confirmed, Whisman arrested Moralez and discovered the marijuana in a search incident to the arrest.

Both parties agree this issue is controlled by *State v. Martin*, 285 Kan. 994, 179 P.3d 457, *cert. denied* 555 U.S. 880 (2008), so we will review that decision in some detail. In *Martin*, law enforcement officers stopped a man for urinating in public but released him after questioning. The officers then noticed the defendant standing about 20 feet away. The officers did not observe the defendant engaged in any suspicious activity. Nevertheless, the offi-

cers "stopped" the defendant and asked for his identification. The defendant was cooperative, identified himself, and provided his date of birth. When the officers ran the information through dispatch, they discovered an outstanding warrant for the defendant's arrest. Upon the defendant's arrest, the officers searched his person and discovered marijuana. In the ensuing prosecution for possessing the marijuana, the defendant filed a motion to suppress the evidence. The district court overruled the motion on the ground that even if the defendant was subjected to an unlawful detention, the discovery of the outstanding warrant mandated his arrest and subsequent search.

On appeal, the Kansas Supreme Court discussed at length the effect of the outstanding warrant on the propriety of the defendant's search. In conducting its analysis, the court presumed that the encounter between the law enforcement officers and the defendant was an unlawful detention. 285 Kan. at 998. The court began its analysis by discussing *State v. Jones*, 270 Kan. 526, 17 P.3d 359 (2001), in which the court had previously held that once officers acting in good faith discovered an outstanding warrant for the defendant's arrest, they had a right to take the defendant into custody pursuant to the warrant and search the defendant incident to the arrest, even though the defendant might have been unlawfully detained prior to the discovery of the warrant. 270 Kan. 526, Syl. Without engaging in extensive analysis, the court in *Jones* reasoned that once a law enforcement officer discovers an outstanding warrant, the officer has the right and duty to arrest the person subject to the warrant whether the person had been lawfully or unlawfully detained prior to discovering the warrant. 270 Kan. at 527-29.

In *Martin*, the court expanded the analysis in *Jones* by noting that "[u]nder the attenuation doctrine, courts have found that the poisonous taint of an unlawful search or seizure dissipates when the connection between the unlawful police conduct and the challenged evidence becomes attenuated. [Citation omitted.]" 285 Kan. at 1003. In order to determine whether there is sufficient attenuation of the causal chain so as to dissipate the taint, a court should analyze three factors: "(1) the time elapsed between the

illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." 285 Kan. at 1003 (citing *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 [1975]).

In applying the three attenuation factors, the court in *Martin* determined that the first factor weighed heavily against the State because the law enforcement officers' actions were continuous and there was no temporal break in the causal chain between the illegality and the acquisition of the evidence. 285 Kan. at 1003. The court determined that the second factor weighed in favor of the State because the discovery of the outstanding arrest warrant constituted the presence of an intervening circumstance between the unlawful detention and the search of the defendant's person. Indeed, the court determined that the defendant's arrest on the warrant "was a lawful, perhaps mandatory, act." 285 Kan. at 1003-04.

The court focused on the third factor, *i.e.*, the purpose and flagrancy of the official misconduct. In analyzing this factor, the court stated:

"While the circumstances might suggest that the officers' purpose in requesting identification to run a warrant check was a fishing expedition, we do not perceive the conduct to be flagrant. The officers were drawn to the particular location because they observed a man who admitted to urinating or attempting to urinate in public. There is nothing to suggest that the officers' ultimate goal in making contact with [the defendant], who was in the immediate vicinity of the urinator, was to search his person for drugs. . . . Further, the intrusion upon [the defendant's] privacy involved a brief conversation in which [the defendant] cooperatively engaged. [Citation omitted.]" 285 Kan. at 1004.

After analyzing all three factors, the court determined that the officers' discovery of the outstanding arrest warrant was an intervening circumstance which sufficiently attenuated the taint of the unlawful detention. Thus, the court unanimously concluded that despite the defendant's unlawful detention, the evidence discovered in the search incident to his arrest was admissible. 285 Kan. at 1005.

Returning to our facts, the district court analyzed the effect of the discovery of Moralez' outstanding warrant under the three factors set forth in *Martin*. As in *Martin*, the district court found that

the first factor, *i.e.*, the time elapsed between the illegality and the acquisition of the evidence, weighed against the State. The district court found that the second factor, *i.e.*, the presence of intervening circumstances, weighed in favor of the State. The district court focused on the third factor, *i.e.*, the purpose and flagrancy of the official misconduct, and found that the officers' conduct in this case was not flagrant or egregious. In so finding, the district court noted that Moralez repeatedly testified that he felt free to leave. The district court reasoned that if the officers' conduct had been so egregious, "I don't believe [Moralez] would have felt that he was free to leave." Thus, the district court concluded that even if Moralez was unlawfully detained, the subsequent discovery of the arrest warrant purged the taint of the unlawful detention.

On appeal, we will review the three attenuation factors considered by the district court and discussed in *Martin*. We must review the district court's factual findings for substantial competent evidence, but we review the district court's ultimate legal conclusion by a de novo standard. *Ransom*, 289 Kan. at 380.

As the district court found, the first factor, *i.e.*, the time elapsed between the illegality and the acquisition of the evidence, weighs against the State. But it would seem that this is almost always the case. In routine police encounters that lead to warrant checks, there is almost always no temporal break between the initial detention and the subsequent discovery of the evidence. The second factor, *i.e.*, the presence of intervening circumstances, weighs in favor of the State. Again, it would seem that this is almost always the case. The discovery of an outstanding warrant informs the law enforcement officer that a magistrate has found there is probable cause to believe that a crime has been committed and that the person subject to the warrant has committed the crime. At that point, it is the officers' duty to execute the warrant by arresting the person named therein. See K.S.A. 22-2305.

As in *Martin*, we will focus on the third attenuation factor, *i.e.*, the purpose and flagrancy of the official misconduct. In his brief, Moralez argues that "the officer's goal in detaining Moralez, who was suspected of nothing illegal, was to check him for warrants, and, inevitably, if a warrant was found, to arrest and search him."

But this assertion is not supported by the evidence. Here, as in *Martin*, there is nothing to suggest that the officers' ultimate goal in contacting Moralez was to search his person for drugs. The officers were initially drawn to the particular location to investigate the vehicle with an expired 30-day tag. Indeed, Whisman and Moralez both testified that Moralez initiated the contact with the law enforcement officers. Whisman asked Moralez to provide his identification in order to document him as a witness. Whisman testified that if Moralez had denied his request for identification or had refused to give his name, there was nothing he would have done.

Whisman did not express any particular reason for running a warrant check on Moralez. Perhaps it was a fishing expedition. But in *Martin*, although the circumstances suggested that the officers' purpose in running the warrant check was a fishing expedition, the court nonetheless stated: "We do not perceive [such] conduct to be flagrant." 285 Kan. at 1004. Finally, as in *Martin*, the intrusion upon Moralez' privacy involved a brief conversation in which Moralez cooperatively engaged. From the time Whisman first observed the parked vehicle to the time Moralez was arrested was 16 minutes. Although the record is not precise on the timing, presumably the amount of time involved in checking Moralez' identification for warrants was only a few minutes.

If anything, the law enforcement officers' conduct in *Martin* appears to have been more flagrant than the officers' conduct here. In *Martin*, the law enforcement officers stopped the defendant for no purpose and immediately asked for his identification in order to run a warrant check. The officers detained the defendant until the warrant check was completed. When an outstanding warrant was discovered, the officers arrested and searched the defendant. Here, the encounter began as an investigation of a vehicle with an expired 30-day tag. Moralez initiated his contact with the law enforcement officers, not the other way around. Whisman later asked Moralez to provide his identification in order to document him as a witness. Whisman testified that if Moralez had denied his request for identification or had refused to give his name, there was nothing he would have done. If the purpose and flagrancy of the official

misconduct in *Martin* weighed in favor of attenuation, as our Supreme Court concluded, we must reach the same conclusion here.

In summary, we find the facts herein to be difficult to distinguish from the facts of *Martin* in any meaningful way. In both cases, the officers encountered a citizen with no suspicion of criminal activity. In both cases, the citizen was presumably unlawfully detained for a brief period of time. In both cases, there was nothing to suggest that the officers' ultimate goal in contacting the citizen was to search the person for drugs. In both cases the officers requested the citizen's identification and for no apparent reason decided to run a warrant check. In both cases, the officers detained the citizen until the warrant check was completed. In both cases, the officers discovered an outstanding arrest warrant and searched the citizen incident to the arrest which led to the seizure of evidence of a crime.

In *Martin*, the court held that the officers' discovery of the outstanding arrest warrant was an intervening circumstance which sufficiently attenuated the taint of the unlawful detention so as to permit the admission of the evidence. 285 Kan. at 1005. The Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position. *State v. Merrills*, 37 Kan. App. 2d 81, 83, 149 P.3d 869, *rev. denied* 284 Kan. 949 (2007). We have no indication our Supreme Court is departing from the unanimous precedent in *Jones* and *Martin*. Based on *Jones* and *Martin*, we conclude the district court did not err by denying the motion to suppress the evidence.

Affirmed.

\* \* \*

ATCHESON, J., dissenting: I respectfully dissent from the majority opinion. My colleagues fail to correctly apply the "attenuation" analysis mandated in *State v. Martin*, 285 Kan. 994, 1003-04, 179 P.3d 457, *cert. denied* 555 U.S. 880 (2008), and, as a result, erroneously affirm the district court's decision denying Joseph Moralez' motion to suppress. I would reverse and remand with directions that the district court grant the motion.

More broadly, I question whether *Martin* reflects sound Fourth Amendment jurisprudence. The Kansas Supreme Court seems to have latched onto a single decision of the United States Court of Appeals for the Seventh Circuit that, as applied here, effectively allows law enforcement officers to accost Kansans, seize their driver's licenses, and run warrant checks on them without any reason or justification. That sort of police conduct is incompatible with a proper reading of the Fourth Amendment and the precepts of a free society the authors of the Bill of Rights envisioned. Rather, by accepting *United States v. Green*, 111 F.3d 515 (7th Cir.), *cert. denied* 522 U.S. 973 (1997), as sound constitutional law, *Martin* permits police to act in a way that would seem more compatible with a totalitarian regime or an occupying force and to do so with impunity. I am neither the first nor the most insightful critic of *Green* in a continuing debate over constitutional freedoms that transcends what happened early one morning on a street in Topeka.

We are constrained to apply *Martin* as controlling authority by dint of *stare decisis*. After recounting the facts briefly—they are set forth in detail in the majority opinion—I undertake that application and explain why I reach a conclusion different from my colleagues' assessment. I then discuss my reservations about *Martin* as a guiding statement of search and seizure law. In turn, I look at the flawed reasoning of *Green*, review pertinent rights protected in the Fourth Amendment, and outline the use of the exclusionary rule to safeguard those rights. Finally, I mention briefly how other courts have divided over this issue. The Sixth Circuit, for example, has just issued a decision rejecting the controlling premise of *Green*. *United States v. Gross*, 624 F.3d 309, 320-22 (6th Cir. 2010).

## I.

During the early morning hours of August 25, 2007, Topeka Police Officer Damon Whisman came upon a lawfully parked car with its lights on. The engine was off, and nobody was in the car. Whisman saw that the car had an expired 30-day tag. At some point, Officer Mark Hilt showed up. Moralez came out on the balcony of

a second floor apartment and asked what was going on. Moralez then went down to the street to talk with Whisman. Why he did so is less than clear from the record, but the reasons are largely immaterial. Moralez said the car belonged to Melody Legate, who was in the apartment. Hilt fetched her. Somewhere in there, the lights on the car shut off automatically.

Whisman spoke with Legate about the expired tag. He then asked Legate and Moralez for identification. She produced a Kansas driver's license; he handed over a Kansas identification card. Whisman later testified he wanted to identify Moralez because he was a witness. The officer then took both pieces of identification with him and ran warrant checks on Legate and Moralez. His dispatcher reported a potential warrant for Moralez. The record does not indicate the offense cited in the warrant. At that point, Whisman told Moralez not to leave. Once the warrant was confirmed, Whisman formally arrested Moralez and asked him if he had anything illegal in his possession. Moralez said he had a baggie of marijuana in his shirt pocket. Whisman searched Moralez and found the marijuana but no other contraband. Moralez was charged with felony possession of marijuana. He filed a motion to suppress the marijuana as the product of an illegal search.

At no time did Moralez say or do anything that caused Whisman to suspect or have reason to suspect him of breaking the law. Moralez did not act in a furtive or sinister manner. Nor did he interfere with the "investigation" of the expired tag or the questioning of Legate. In short, Whisman had no basis to lawfully detain Moralez until the warrant check turned up the criminal charge. The officer conceded as much at the suppression hearing. At the hearing, Moralez testified that at least a couple of times before he gave up his identification card the officers told him not to go anywhere. Whisman testified otherwise. The trial judge neither resolved that credibility dispute nor made a factual finding on the point. Moralez also testified that until he was arrested, he felt as if he could have freely withdrawn from the police officers.

The district court denied the motion to suppress. Moralez was then convicted in a bench trial. Moralez has properly perfected an

appeal and challenges the district court's ruling denying suppression of the marijuana.

## II.

A.

In *Martin*, the Kansas Supreme Court laid out a two-step analysis for determining when evidence obtained following an unlawful seizure of an individual might be used against that individual. 285 Kan. at 998. The first step requires judicial determination of whether law enforcement officers actually have effected an illegal seizure. If the detention comports with the Fourth Amendment, then evidence secured as a result is freely admissible in any prosecution. And there is no need to undertake the second step of the *Martin* analysis.

The second step supposes an illegal seizure and asks whether there has been some intervening circumstance of sufficient magnitude to separate the unlawful police conduct from the discovery of the evidence in a way that the constitutional violation cannot be said to have directly led to or produced the evidence. The court refers to that as an attenuation or taint analysis. 285 Kan. at 1003. In other words, is the evidence sufficiently attenuated from the illegal seizure as to dissipate any constitutional taint? That determination depends upon three factors: (1) the time between the illegal detention and the discovery of the evidence; (2) "the presence of intervening circumstances; and (3) the purpose and the flagrancy of the official misconduct." 285 Kan. at 1003. Each of the factors must be considered, and no one automatically eclipses the other two. See 285 Kan. at 1003.

The United States Supreme Court applied an attenuation analysis and considered those factors, among others, in *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975), to determine if a defendant's confession could be used as evidence even though the defendant had been unlawfully arrested before being interrogated. Nine years ago, the Kansas Supreme Court transplanted that analysis to a factual scenario in which law enforcement officers illegally detained an individual, immediately learned of a warrant for that person, and then uncovered evidence

during a search made in conjunction with the arrest of the person on the warrant. *State v. Jones*, 270 Kan. 526, 527-28, 17 P.3d 359 (2001). The *Jones* decision, in turn, principally looked to *Green*, 111 F.3d at 521, as authority for that particularized use of the attenuation doctrine. As I discuss more fully below, *Green* reflects a doubtful extension of *Brown* that cannot be easily reconciled with elemental Fourth Amendment principles.

Nonetheless, through *Jones* and *Martin*, the *Green* decision has come to be the law of Kansas. And, as I have acknowledged, we are compelled to apply that Fourth Amendment trilogy. Before doing so in this case, I offer several fundamental Fourth Amendment principles by way of context for that exercise.

B.

First, of course, the Fourth Amendment, as applied to state and local government agents through the Fourteenth Amendment, provides that "the people shall be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In weighing whether police have violated the Fourth Amendment, the courts are to look at the totality of the circumstances. *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 619, 109 S. Ct. 1042, 103 L. Ed. 2d 639 (1989) ("What is reasonable, of course, 'depends on all of the circumstances surrounding the search or seizure and the nature of the search and seizure itself.'") (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S. Ct. 3304, 87 L. Ed. 2d 381 [1985]); see *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1309 n.7 (10th Cir. 2006). Generally, evidence police obtain following an illegal seizure of a citizen should be suppressed if that evidence results from the "exploitation of that illegality." *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (The evidence, then, is the proverbial "'fruit of the poisonous tree'"; though in less horticultural terms, it might aptly be considered the illegitimate residue of a Fourth Amendment degradation.). As I discuss more fully later, the exclusionary rule serves to deter law enforcement officers from conducting searches or seizures they reasonably should know violate the Fourth Amendment. Conversely, evidence may be used

against a defendant despite an illegal seizure if law enforcement has acquired it " 'by means sufficiently distinguishable to be purged of the primary taint' " of the improper police conduct. 371 U.S. at 487-88. Likewise, if an officer acts in what objectively looks to be a good-faith effort to conform to constitutional requirements, the courts may admit evidence even though it amounts to the product of an illegal search or seizure. See *United States v. Leon*, 468 U.S. 897, 919-21, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984); *State v. Hoeck*, 284 Kan. 441, 442, 163 P.3d 252 (2007) (incorporating *Leon* good-faith exception to exclusionary rule into Kansas law).

In this country, we do not allow law enforcement personnel to detain people on the street for no reason and then to hold them to look for outstanding criminal charges. See *Hamdi v. Rumsfeld*, 542 U.S. 507, 529, 124 S. Ct. 2633, 159 L. Ed. 2d 578 (2004) ("[T]he most elemental of liberty interests [is] the interest in being free from physical detention by one's own government."); *Terry v. Ohio*, 392 U.S. 1, 8-9, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The Fourth Amendment says a government agent cannot treat a citizen that way. As the *Terry* Court recognized, at the very least, a police officer must justify the detention of a person on a street with "specific and articulable facts" raising a reasonable suspicion of illegal activity. 392 U.S. at 20-23. An officer, however, may not act on a mere "hunch" in detaining a person, 392 U.S. at 22, or without any basis whatsoever. In sum, an investigative detention of the sort endorsed in *Terry* satisfies the Fourth Amendment only if the officers can justify their actions based on demonstrable circumstances establishing a reasonable suspicion linking the individual to criminal activity. See *United States v. Lambert*, 46 F.3d 1064, 1069 (10th Cir. 1995).

A *Terry* detention is intended to be brief and does not amount to an actual arrest. Basically, an officer may quickly investigate that reasonable suspicion of wrongdoing afoot. He or she may question the individual and make a pat-down search for weapons. *Arizona v. Johnson*, 555 U.S. 323, 327, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009) (investigatory *Terry* stop may entail frisk or pat-down for weapons if officer reasonably suspects individual may be armed); *Hayes v. Florida*, 470 U.S. 811, 816-17, 105 S. Ct. 1643, 84 L. Ed.

2d 705 (1985) (officer "may question [person] briefly" during *Terry* stop). During a *Terry* seizure, the officer may require the person detained to identify himself or herself. *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty*, 542 U.S. 177, 185-86, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004); *INS v. Delgado*, 466 U.S. 210, 216-17, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984). And a state may criminalize the refusal of a person to provide identification during a *Terry* stop. *Hiibel*, 542 U.S. at 188-89.

If an officer has no reasonable suspicion sufficient to support a seizure under *Terry*, the officer may approach a person and ask the individual's identity or otherwise engage in conversation. *Florida v. Bostick*, 501 U.S. 429, 434-35, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991); *United States v. Hudson*, 405 F.3d 425, 438 n.10 (6th Cir. 2005). But the person may refuse to respond, since any exchange with the officer is purely voluntary. While the officer need not inform the individual he or she may decline to answer, the officer cannot verbally or physically inhibit a refusal or coerce a response. *Bostick*, 501 U.S. at 437. Such conduct typically would transform a voluntary encounter into a seizure under the Fourth Amendment. See *State v. Pollman*, 286 Kan. 881, 888, 190 P.3d 234 (2008); *Hudson*, 405 F.3d at 438 n.10.

A police officer may arrest and detain a person if the officer has probable cause to believe that individual has committed a crime. Probable cause requires the officer to have knowledge of facts that would lead a reasonably cautious person to conclude the suspect's involvement in a crime was "more than a possibility." *State v. Aikins*, 261 Kan. 346, 355, 932 P.2d 408 (1997). See also *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979) ("This Court has repeatedly explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, the suspect has committed . . . an offense."); *Dunaway v. New York*, 442 U.S. 200, 208 n.9, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979). While that is not an especially high standard, it requires more information than the reasonable suspicion necessary for a brief *Terry* stop. *Pollman*, 286 Kan. 881, Syl. ¶ 6. Likewise, an

officer may arrest a person based on an outstanding warrant. K.S.A. 22-2401(a) (officer may arrest a person if officer has a warrant for that person). By his own admission, however, Whisman had no grounds, reasonable or otherwise, to detain Moralez. And since Whisman had no reason to even suspect Moralez of criminal activity, he lacked probable cause or any other basis to make an arrest before learning of the outstanding warrant.

## C.

The majority declines to decide whether Moralez had been illegally seized and ultimately concludes, for forensics purposes only, that he had. The law, however, seems amply clear on the facts here that Whisman illegally detained Moralez at the point he physically took possession of the identification card to run the warrant check. That conclusion bears directly on the third factor in the attenuation analysis—purposefulness and flagrancy.

Whisman had no lawful reason to seize or detain Moralez at the time he asked for the identification card. He had no suspicion (reasonable or otherwise) to believe Moralez had done anything wrong so as to justify an investigatory detention, let alone a full-blown arrest. Nobody has even hinted there might have been grounds to detain Moralez as a matter of public safety. There wasn't. (While law enforcement officers commonly invoke public safety in conjunction with stopping a motor vehicle, the rationale readily justifies contact with citizens in other contexts. For example, an officer might well make a public safety "stop" of an apparently distraught pedestrian or of a person passed out on a park bench. If, in doing so, the officer discovers contraband, such as drug paraphernalia in plain view, that evidence ought to be admissible in a criminal prosecution of the individual.)

The record here is unclear why Moralez came down from the apartment to the street in the first place. The testimony at the suppression hearing was vague and indefinite on the point. I think the majority properly concludes Moralez was not responding to a direct order, and his contact with Whisman, therefore, began on a voluntary basis. The complexion of the encounter materially

changed for Fourth Amendment purposes when Whisman took Moralez' identification card.

In assessing whether a citizen-police encounter has lost its voluntary character and has become a seizure for Fourth Amendment purposes, the courts look at all of the surrounding circumstances. *Brendlin v. California*, 551 U.S. 249, 255, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007); *Pollman*, 286 Kan. at 887-88. Basically, a court must determine if those circumstances were such that a reasonable person would not have felt free to end the encounter and leave. The standard has been articulated in a variety of ways using essentially synonymous phrasing. *Brendlin*, 551 U.S. at 255 (The Court determines whether a Fourth Amendment seizure has occurred by asking "whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.' [Citations omitted.]"); *Pollman*, 286 Kan. at 888 ("[T]he test is whether a reasonable person in [the citizen's] position would have felt free to decline [the officer's] requests or otherwise terminate the encounter."). The Kansas Supreme Court has recently said no seizure takes place if " 'a reasonable person would feel free to "disregard the police and go about his business." ' " *State v. McGinnis*, 290 Kan. 547, 552, 233 P.3d 246 (2010). As the majority correctly points out, because the courts look only at how "a reasonable person" would view the police conduct, the subjective or unspoken beliefs of the law enforcement personnel or the individual detained do not enter into the legal assessment. *Michigan v. Chesternut*, 486 U.S. 567, 574, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988) ("This 'reasonable person' standard also ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached."); *State v. Thompson*, 284 Kan. 763, 807, 166 P.3d 1015 (2007).

The courts have regularly recognized that law enforcement officers almost invariably effect a Fourth Amendment seizure of a citizen when they hold a driver's license, an identification card, a vehicle registration, or similarly important papers belonging to the individual. *Guerrero-Espinoza*, 462 F.3d at 1309 n.8 (collecting cases); *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005); *Pollman*, 286 Kan. at 889 (An officer's retention of a person's

driver's license, absent some "offsetting circumstances," probably effects a seizure for Fourth Amendment purposes.). For example, federal drug agents seized an individual when they accosted him in an airport parking lot, asked for and retained his driver's license, and then interrogated him about his activities. *Lambert,* 46 F.3d at 1068 ("[W]hat began as a consensual encounter quickly became an investigatory detention once the agents received Mr. Lambert's driver's license and did not return it to him."). Simply put, a reasonable person would not feel free to break off an encounter with a police officer and, in doing so, leave behind vital personal documents. Indeed, that reasonable person likely would have a difficult time going about his or her business without a driver's license or other identification. 46 F.3d at 1068. See also *United States v. Lopez,* 443 F.3d 1280, 1285 (10th Cir. 2006) (A police officer effects a seizure of an individual by retaining his or her driver's license for 5 minutes to run a warrant check.); *State v. Daniel,* 12 S.W.3d 420, 427 (Tenn. 2000) (In finding police seized a young man outside a convenience store when they took his identification, the court states: "Abandoning one's identification is simply not a practical or realistic option for a reasonable person in modern society.") (cases cited).

Whisman seized Moralez within the meaning of the Fourth Amendment when he took physical possession of Moralez' identification card and held it to run a warrant check. And because Whisman had no lawful basis to detain Moralez at that point, the seizure violated Moralez' constitutional rights. We needn't just hypothecate that legal conclusion for purposes of creating a foundation for *Martin's* attenuation analysis. Instead, we ought to call the facts for what they are: A Fourth Amendment violation, plain and simple. See *Florida v. Royer,* 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (plurality opinion) (A person "may not be detained even momentarily without reasonable, objective grounds for doing so.") (This actually appears to be a holding of a court majority. In an opinion joining in the judgment of his four colleagues, Justice Brennan plainly supports that statement of Fourth Amendment law. 460 U.S. at 512 [Brennan, J., concurring] [Because federal agents had no reasonable suspicion to detain Royer, his seizure

was illegal.]); *United States v. Fox*, 600 F.3d 1253, 1258-59 (10th Cir. 2010); *Lopez*, 443 F.3d at 1285.

I disagree with the majority that the facts surrounding the origin and the evolution of the encounter are "critical" to the determination of a Fourth Amendment violation. I have assumed Moralez voluntarily left the apartment, and I have assumed the officers did not tell him to stay put after he got to the street but before they learned of the warrant. (The trial court made no findings on those circumstances.) Even with those givens, however, Moralez was unconstitutionally seized when Whisman took his identification card and did not promptly return it. If the trial court were to come down contrary to either or both of my assumptions, that would only enhance the conclusion that Moralez had been illegally detained.

## D.

Given the constitutional breach, *Martin* requires an attenuation analysis. At the outset, I take issue with the methodology the majority opinion uses to consider the three factors in arriving at an ultimate determination as to whether the discovery of the challenged evidence is sufficiently divorced from the constitutional violation. The majority seems to give each factor equal weight without regard to the particularized facts. And, in turn, so long as two of the three factors favor the government, the motion to suppress should be denied (as the majority determined here). In other words, for the majority, the best two out of three factors wins. That seems unduly mechanistic, especially in such an intricate and often subtle area of the law as Fourth Amendment jurisprudence. The better approach and the one more in keeping with the overarching method for evaluating Fourth Amendment issues would look at the totality of the circumstances bearing on the three factors and any other case-specific facts pertinent to taint and attenuation. Under that regimen, an especially compelling or clear result favoring the government as to one factor might well override much closer results on the other two factors favoring the defendant. But, of course, the converse would be true as well: Close calls for the government on two components might come up short as against

an overwhelming result favoring the defendant on the remaining one.

Considering the factors as an amalgamation rather than as self-contained criteria to be tallied on a scorecard like rounds in a boxing match also fits better with the United States Supreme Court's approach in *Brown* itself. There, the Court characterized the three factors as being "relevant" to the attenuation inquiry, though nothing in the opinion suggests they should be treated as the exclusive considerations. 422 U.S. at 603-04. Indeed, in that case, which involved a confession, the Court observed that "[n]o single fact is dispositive" of whether the defendant's statement was "the product of a free will" and pointed out that the administration of *Miranda* warnings also figured into the analysis. 422 U.S. at 603. The Supreme Court more recently noted that all of those circumstances are to be considered "relevant" in determining whether a confession has been tainted by an illegal detention. *Kaupp v. Texas*, 538 U.S. 626, 632-33, 123 S. Ct. 1843, 155 L. Ed. 2d 849 (2003).

With that in mind, I look at each of the factors and then incorporate the specific considerations on each into a unified whole addressing attenuation.

The lapse of time between the unlawful seizure and the discovery of the challenged evidence is an easy call here, as everyone agrees. Only a matter of a few minutes separated the two events in this case. That weighs heavily against attenuation and strongly in favor of suppression. We might fairly conclude on the facts here that the chronology suggests no attenuation.

The second factor—intervening circumstances—presents perplexing considerations. Relying on *Martin*'s determination that an officer's discovery of an arrest warrant effectively dissipates the taint of an unlawful detention, the majority chalks this factor up for the government. On this point, the facts in *Martin* cannot be distinguished in any meaningful way from what happened here. As a result, the force of *stare decisis* requires me to agree with the majority. Logic, however, points the other way. As *Wong Sun* defines the issue, courts are to ask if the challenged evidence came to light " 'by exploitation of the illegality.' " 371 U.S. at 487-88. Here, that is precisely what happened. The interaction between

Moralez and Whisman turned into an unconstitutional seizure because the officer took physical possession of the identification card and held it for the specific purpose of running a warrant check. In short, Whisman acted as he did because he wanted to run a warrant check on Moralez. That check, of course, revealed a warrant and prompted the formal arrest and search of Moralez. The very act on the part of the officer that rendered the encounter a Fourth Amendment violation also yielded the justification for the search. I fail to see how there was anything other than "exploitation" here in the *Wong Sun* sense.

There likely would have been no constitutional violation had Whisman looked at the identification, copied down the name and address, and immediately handed it back to Moralez. See *Lopez*, 443 F.3d at 1285 (When a police officer was able to establish an individual's identity "within seconds of reviewing" the person's license, the "continued retention of [the] license was undue" and amounted to a Fourth Amendment seizure.). Moralez then would have been free to leave (at least on the facts as I have presumed them to be). And Whisman could have run a warrants check on Moralez if he wanted. Had Moralez voluntarily remained on the street, Whisman then could have arrested him on the warrant and searched him incident to that arrest. In that scenario, it seems to me the search would have been constitutionally unobjectionable. See *United States v. Villagrana-Flores*, 467 F.3d 1269, 1277 n.4 (10th Cir. 2008).

Some might say that the difference between the two sets of circumstances is mighty finespun. But much in contemporary Fourth Amendment law depends upon seemingly slight variations on otherwise common factual patterns. For example, if an officer completes a traffic stop and then asks the driver for consent to search the car, the courts likely will uphold a resulting discovery of contraband so long as the officer had first returned the driver's license. The encounter and the consent would be considered voluntary at that point. If the officer were to ask for consent before returning the license, the consent likely would be held invalid and the search illegal. The driver would not have been free to leave or to withhold consent while the officer retained the license. See *United States v.*

*Walker*, 933 F.2d 812, 817-18 (10th Cir. 1991), *cert. denied* 502 U.S. 1093 (1992) (On remand, the district court found the driver's consent to search to be involuntary because it was given while the officer retained the individual's license. *United States v. Walker*, 807 F. Supp. 115, 118-19 [D. Utah 1992]).

On the third factor, the majority finds the contact between Whisman and Moralez to be something short of "flagrant" and thus gives the tie-breaker to the government. The majority relies on the comparatively brief duration of the overall encounter and, at least tacitly, on the lack of any display of overt force by the police officers. They did not hold Moralez at gunpoint or rough him up. That's to their credit. But it suggests only that the flagrancy was not so pronounced as it might have been.

The drafters of the Bill of Rights determined the government's seizure of citizens without some specific, justifiable basis would replicate the intolerable oppression the British Crown visited upon the Colonists, and they offered the Fourth Amendment as the primary protection against that abuse. In turn, deliberate actions of government agents that transgress recognized constitutional protections generally ought to be treated as nothing short of flagrant. *Herring v. United States*, 555 U.S. 135, 143, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) (In considering flagrancy of police conduct and the application of the exclusionary rule, the courts should consider "if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."); *Illinois v. Krull*, 480 U.S. 340, 348-49, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987); *Taylor v. Alabama*, 457 U.S. 687, 693, 102 S. Ct. 2664, 73 L. Ed. 2d 314 (1982) (That police officers did not physically abuse suspect does not vitiate or mitigate the constitutional violation resulting from his arrest, detention, and interrogation "without probable cause . . . in the hope that something would turn up."); *Brown*, 422 U.S. at 610-11 (conduct would be "flagrantly abusive of Fourth Amendment rights" when, for example, "factors relied upon by the police in determining to make [an] arrest were so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable") (Powell, J., concurring in part); *Walker*,

807 F. Supp. at 117-18 (law enforcement officer's conduct "flagrant" when officer detains a person without justification in violation of an established constitutional right); *cf. Dalia v. United States*, 441 U.S. 238, 246-47, 99 S. Ct. 1682, 60 L. Ed. 2d 177 (1979) (surreptitious planting of eavesdropping equipment without judicial authorization reflects conduct " 'flagrantly, deliberately, and persistently violat[ing] the fundamental principle declared by the Fourth Amendment.' " Those agents should not get a pass when they flout the Bill of Rights simply because they refrain from using physical force or a display of firearms to do so. Nor should they avoid appropriate consequences because they accomplish the violation with dispatch.

In this case, Whisman seized Moralez without *any* legitimate grounds. There was no probable cause. There was no reasonable suspicion. Whisman decided he wanted to run a warrant check on Moralez because he felt like it, and he held Moralez' identification card while he did so—effectively freezing Moralez during that process. A well-trained law enforcement officer in Whisman's position should have known that he could not keep an individual's driver's license or otherwise detain that person without some demonstrable reason. Those have been settled rules of search and seizure law for years. Law enforcement personnel disregarding those rules necessarily act in flagrant disregard of the Fourth Amendment.

Another troubling aspect to this particular incident bearing on flagrancy is Whisman's explanation for his conduct in seizing Moralez' identification card and running the warrant check. The officer testified that he wanted to identify Moralez as a potential witness in the expired-tag caper. Taking that explanation at face value, it does not justify detaining Moralez to run the warrant check. The officer's actions would plainly seem to overstep his stated purpose. That adds to the flagrant character of the conduct. (The record is silent—nobody asked during the suppression hearing—whether Whisman detains every witness or potential witness for a warrant check or if the Topeka Police Department has a standard operating procedure calling for that sort of investigatory detention of nonsuspects. A blanket policy, whether as a matter of departmental procedure or the officer's practice, would not undo

the constitutional violation. If Whisman selectively runs records checks on witnesses, how does he make that selection? And why did he choose Moralez?)

I would find the officer's conduct here to be deliberate and in clear violation of settled Fourth Amendment principles and, therefore, flagrant. The majority says *Martin* compels the opposite conclusion as controlling and legally indistinguishable authority. The *Martin* court certainly suggests it saw little that might be considered flagrant in the police encounter there. 285 Kan. at 1004. And that encounter, as described in the opinion, is quite similar to the interaction between Whisman and Moralez. But the court appears to consider the absence of coercive force on the part of the police to be determinative and really does not give much, if any, weight to the patent quality of the constitutional violation. The United States Supreme Court, however, has recognized the latter merits a substantial place in a court's consideration. Moreover, an illegal detention, though brief, inflicts more than some technical harm or wrong. *Terry*, 392 U.S. at 16-17 ("[I]t is simply fantastic to urge" that a stop-and-frisk on a public street amounts to " 'a petty indignity.' "). (A stop-and-frisk, of course, entails both a search and a seizure. In this case, Moralez was illegally seized initially, but not searched until after the warrant check. That, however, does not negate the constitutional violation or make it any less plain a violation.)

Even if *stare decisis* requires us to minimize the import of the officer's conduct, the overall circumstances still do not support attenuation. At best, two factors narrowly favor the government—intervening cause and flagrancy. And they do so primarily because of the deference to be accorded *Martin*. But the final factor—temporal proximity—is not close and strongly weighs against attenuation. The totality of the circumstances then counsels against attenuation of the "taint" caused by the illegal detention. Accordingly, the motion to suppress should have been granted, and the trial court should have excluded the marijuana as evidence.

As I discuss more fully below, courts protect Fourth Amendment rights through the exclusionary rule by denying the government the use of evidence obtained as a result of an illegal search or

seizure. In turn, government agents should then be deterred from initiating conduct violating the Fourth Amendment, since they would lose the benefit of any evidence they might uncover. The real point, however, is to spare law-abiding citizens that conduct by discouraging law enforcement officers from acting in unconstitutional ways. By throwing out the evidence Whisman obtained from Moralez—the baggie of marijuana—the courts safeguard the Fourth Amendment with a result that will dissuade police officers from detaining other people (my next door neighbor or a teacher who works at the elementary school around the corner) without a proper legal basis.

## III.

Having tracked through the attenuation analysis required under *Martin,* I could stop. My discussion to this point deals with the specific legal issues necessary to resolve this particular case. Left unaddressed, however, is the constitutional propriety of the *Martin-Jones-Green* trilogy. Because *Green* seems suspect and has been incorporated into the constitutional common law of this state, I believe it might be useful to engage the broader topic. The Kansas Supreme Court likely will be giving further consideration to the issue, since it has granted review in *State v. Williams,* No. 101,617, unpublished opinion filed January 22, 2010, *rev. granted* July 1, 2010. The *Williams* case arose from a police-citizen interaction comparable to the ones in *Martin* and here, and the controlling legal issue turns on the application of the same Fourth Amendment principles. The outcome in *Williams* fragmented the Court of Appeals panel resulting in a lead opinion, a concurrence, and a dissent. Each of those opinions considers how *Martin* and its attenuation analysis should be applied.

First, I will trace briefly how *Green* became part of Kansas law, although I have mentioned that course. Then, I look at the reasoning in *Green* and discuss several aspects of Fourth Amendment law pertinent to its efficacy, including the attenuation doctrine and the exclusionary rule. Finally, I look at how other courts have treated *Green* and its approach. While that Fourth Amendment analysis has enjoyed support in some quarters, it has been much

criticized in others. Ultimately, the *Green* rationale ill serves the purposes of the Fourth Amendment.

A.

The Kansas Supreme Court first turned to *Green* as a Fourth Amendment exemplar in *Jones*, 270 Kan. at 527-28, and did so in a single paragraph accompanied by another paragraph quoting from the Seventh Circuit decision. The court offered neither an explanation of why *Green* should occupy such an authoritative position in search and seizure law in this state nor an assessment of the applicability of the attenuation doctrine to a search made pursuant to a warrant check conducted in the course of a constitutionally unjustified seizure. That is, the court articulated no independent evaluation of the *Green* rationale before endorsing it. 270 Kan. at 527-28.

As part of that analysis, the *Jones* opinion also cites several cases from other states for the proposition that police officers properly may arrest someone on a warrant disclosed during a records check conducted as part of an unconstitutional seizure. And, in turn, the criminal charges should not be dismissed on the grounds that the initial detention violated the Fourth Amendment. 270 Kan. at 528-29. The court's observation reflects an accepted legal proposition. See *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984) ("The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded than an unlawful arrest, search, or interrogation occurred."); *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975) (noting "the established rule that illegal detention or arrest does not void a subsequent conviction"); *Hudson*, 405 F.3d at 439; *cf. United States v. Alvarez-Machain*, 504 U.S. 655, 661-62, 112 S. Ct. 2188, 119 L. Ed. 2d 441 (1992) (recognizing that "the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a forcible abduction" amounting to a kidnapping). But it does not appreciably advance the argument that evidence discovered during a search immediately following an arrest on the warrant should be

admitted at trial notwithstanding the illegality of the initial detention during which the police learn of the warrant. The two issues are not linked or analogous. They can and should be addressed as independent Fourth Amendment issues. In this case, Moralez has never suggested he could not be prosecuted on the charge in the warrant because it came to light during an illegal detention.

In *Martin*, the Kansas Supreme Court essentially restates *Jones* and then applies the attenuation analysis outlined in *Green*. 285 Kan. at 998-1000, 1003. The *Martin* decision does so without explicitly examining the soundness of *Green*. The opinion simply accepts as a given the constitutional propriety of using the attenuation doctrine to neutralize an illegal seizure of a person if an immediate warrant check turns up an outstanding charge and the resulting arrest uncovers contraband or evidence implicating the individual in an unrelated criminal offense. That traces current Kansas law back to *Green*.

B.

In *Green*, two police officers on routine patrol in Champaign, Illinois, noticed a car they had seen the day before when it was parked in front of the house of an individual wanted on a federal warrant for a weapons offense. Believing the fugitive might be in the car or the occupants might know of his whereabouts, the officers followed the vehicle until it pulled into a driveway. The officers then positioned their patrol car so as to block the driveway and accosted the occupants of the car. The officers requested and received driver's licenses from the pair showing them to Avery Green and David Green. The officers ran warrant checks on the brothers Green and discovered an outstanding warrant for Avery. He was immediately arrested. Incident to that arrest, the officers searched the car and found crack cocaine and a handgun. The officers then arrested David. After being charged with federal drug and weapons crimes, David filed a motion to suppress the contraband seized from the car.

The Seventh Circuit Court of Appeals found that the circumstances failed to establish a reasonable suspicion for detaining the Green brothers in the first instance. 111 F.3d at 520. And, in turn,

the officers also violated the Fourth Amendment by detaining the pair to run the computer search for arrest warrants. 111 F.3d at 520. To that point, of course, the court's reasoning supports the conclusion that Moralez had been unconstitutionally detained during the warrant check Whisman conducted in this case. See also *State v. Page*, 140 Idaho 841, 845, 103 P.3d 454 (2004) (pedestrian unlawfully seized when officer takes his identification card to run warrant check absent any reasonable suspicion of wrongdoing).

The Seventh Circuit panel then turned to the language of *Wong Sun*, 371 U.S. at 487-88, suggesting that evidence need not be suppressed if the taint of an illegal seizure resulting in its discovery has been sufficiently purged. 111 F.3d at 520. And the panel pirated the attenuation analysis adopted in *Brown*, 422 U.S. at 603-04, to measure whether a confession made during an illegal detention might be salvaged as admissible evidence. 111 F.3d at 521. The appellate court hardened the discussion of "relevant" circumstances in *Brown* into the "three-factor" test for attenuation that has been adopted in *Jones* and *Martin*. 111 F.3d at 521.

The *Green* panel acknowledged that in the 20 years following *Brown*, no court had applied that attenuation-of-taint evaluation to factual circumstances akin to those presented in that case. 111 F.3d at 521 ("[T]here is no case law directly on point."). Rather, the attenuation doctrine had been applied to confessions obtained following an illegal arrest (the issue in both *Wong Sun* and *Brown*), to consents to search given during or following an illegal detention, and to confessions voluntarily given by a suspect who had already made inculpatory statements during a custodial interrogation without having received *Miranda* warnings. 111 F.3d at 521 (cases cited). In short, the *Brown* analysis had been used to determine whether a suspect's own conduct in confessing or giving consent had been sufficiently divorced from an illegal seizure to be constitutionally acceptable. The issue in *Green*, however, dealt only with the ongoing conduct of the police officers in seizing and searching the brothers. The two scenarios present materially different constitutional questions. The *Green* decision neither acknowledged that distinction nor explained why the earlier uses of the *Brown*

analysis should be transplanted to measuring the Fourth Amendment implications of law enforcement conduct alone.

Instead, the *Green* panel touts three circuit cases as being "closely analogous" to the facts presented there and, thus, justifying its expansion of the attenuation doctrine to uphold the search essential to the charges against David Green. The result of that expansion, of course, was a commensurate contraction of the Fourth Amendment so that it no longer protects a citizen from an unjustified stop and warrant check by law enforcement authorities. Apart from the constitutional consequence, however, the case authority the panel invokes is obviously distinguishable and wholly fails to advance the theory upon which *Green* rests.

In *United States v. Nooks*, 446 F.2d 1283 (5th Cir. 1971), three men held up a bank and fled in a Chevrolet car. A sheriff's officer alerted to the robbery stopped the defendant, although he seemed to be alone in his Chevrolet. The driver appeared unusually nervous and prattled on about trivial matters in a way that made the officer suspicious. Without anything more tangible to go on, the officer arrested the driver. The man was told to drive his own car to the police station in the middle of a convoy of law enforcement vehicles that had arrived on the scene. (That seems a rather quaint way of handling the custodial arrangements, but no matter.) Presented with the opportunity, the suspect bolted. In the chase that followed, he got the Chevrolet up to 115 mph and had a sufficiently steady hand to shoot at the officers chasing him. Finally, the car ran into a ditch. The officers saw two other men get out of the trunk and arrested them. The officers then found a money box from the bank in the trunk and a handgun on the floorboard. The three defendants moved to suppress the physical evidence. The trial judge and the appellate court made short work of that effort. Without deciding if the initial stop of the car could be justified or not, both courts found that the driver's high-speed escape and gun battle furnished an independent ground for his arrest once the vehicle came to rest in the ditch, and, in turn, the officers properly arrested his compatriots and conducted their search. 446 F.2d at 1288.

The decisions in *United States v. Bailey*, 691 F.2d 1009 (11th Cir. 1982), and *United States v. Dawdy*, 46 F.3d 1427 (8th Cir. 1995), fit the same legal mold as *Nooks* without the same factual panache. In *Bailey*, DEA agents at Hartsfield Airport in Atlanta accosted Bailey; they suspected him of drug trafficking. In speaking with him, the agents considered his answers and demeanor to be suspicious. Bailey reluctantly agreed to accompany them to a secure area to be searched for contraband. Before they arrived, Bailey dropped his bag and began to run. A fleet agent caught up to Bailey, and the pair exchanged blows. The agent subdued Bailey, handcuffed him, and searched him. The search turned up illegal drugs and a wad of cash. Bailey was charged with drug offenses and moved to suppress the evidence seized from him as the product of an illegal arrest. The Eleventh Circuit Court of Appeals assumed the initial stop of Bailey to be illegal for purposes of analyzing the trial judge's denial of the motion. Citing *Brown* and *Nooks*, among other cases, the appellate court held that when a suspect responds to an illegal detention in a way constituting an independent crime, he or she may be lawfully arrested for that crime and a resulting search will be constitutionally sound. 691 F.2d at 1016-17. Accordingly, when Bailey fled and then fought with the DEA agent, the officers had probable cause to believe he had committed a new crime in their presence. He could be lawfully arrested and searched in conjunction with that crime.

In *Dawdy*, the Eighth Circuit reversed the trial judge's decision to suppress incriminating evidence indicative of drug trafficking. The panel found an officer had a sound basis for a *Terry* stop and the discovery of a pouch of suspicious white powder (later determined to be methamphetamine) next to Dawdy's car supported Dawdy's arrest and a search of the vehicle. As an alternative ground, the court noted that Dawdy physically resisted arrest and struggled or fought with one of the officers attempting to handcuff him. Citing *Nooks*, *Bailey*, and other authority, the court recognized that Dawdy's obstructionist and belligerent behavior furnished an independent basis for the arrest and search that would have insulated the evidence on the Fourth Amendment challenge to the initial stop. 46 F.3d at 1430-31.

On their facts, *Nooks*, *Bailey*, and *Dawdy* all represent sound results and good constitutional law. There is little question a suspect's flight once officers have attempted to place him or her in custody or to investigate specific criminal activity furnishes at least reasonable suspicion and typically probable cause wholly independent of any unlawful seizure to that point. *United States v. Bonner*, 363 F.3d 213, 218 (3d Cir. 2004). See also *Illinois v. Wardlow*, 528 U.S. 119, 124-25, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) (person's unprovoked flight in high-crime area upon seeing police officers supports investigative detention); *United States v. Gilliam*, 520 F.3d 844, 847 (8th Cir. 2008); *Oliver v. Woods*, 209 F.3d 1179, 1188 (10th Cir. 2000). A suspect who has been formally arrested (whether constitutionally justified or not) and flees commits an independent crime justifying a new arrest and search, as was the case in *Nooks*. See, *e.g.*, K.S.A. 21-3808 (obstruction of official duty); K.S.A. 21-3809 (escape from custody includes "departure . . . without lawful authority" from custody after an arrest). Likewise, a suspect who physically resists arrest or assaults the arresting officer commits an independent crime supporting a lawful search. See, *e.g.*, K.S.A. 21-3413 (battery against a law enforcement officer); K.S.A. 21-3415 (aggravated battery against a law enforcement officer).That was true in each of the three cases. But there was nothing comparable in *Green* or here. Had Moralez taken off running while Whisman was checking on warrants, I likely wouldn't be writing this dissent.

The *Green* panel discusses *Nooks*, *Bailey*, and *Dawdy* only in extremely generic terms and never really explains just why they should be considered obvious counterparts to the facts of that case or how they jurisprudentially support denial of the motion to suppress at issue there. The panel essentially submits that in each of those cases, the officers had an independent legal basis to arrest the suspect or suspects, thereby overcoming any constitutional defect in the original seizure. But the *Green* decision glosses over the key fact common to those three cases and entirely lacking in the case it was to decide: The suspects committed crimes in the presence of the officers—attempting to flee or resist to one degree or another—that would justify a new or separate arrest and resulting

search. A suspect's own actions during the course of a detention amounting to a new crime would seem to furnish the requisite "intervening circumstance" of the sort contemplated in an attenuation analysis laid out in *Brown* and, more broadly, a "significantly distinguishable means" for a constitutionally proper search as contemplated in *Wong Sun*.

Neither of the Green brothers acted in that way. Nor did Moralez in this case. An officer's decision to run a warrant check on a person who has been illegally seized differs materially from arresting a suspect based on his or her flight or fight amounting to a crime. A suspect's misconduct marks a distinct break in the *officers'* actions flowing from and originating in an initial and constitutionally insupportable detention in a way a warrant check does not. Indeed, as I pointed out earlier, a warrant check not only flows seamlessly from an illegal detention of the sort inflicted on Moralez, it is inextricably tied to the purpose of the detention.

The *Green* decision attempts to shore up that rather gaping hole by suggesting it is oftentimes difficult to determine if the taint of an illegal detention has been dissipated before a defendant confesses or consents to a search. 111 F.3d at 522. But, the court reasoned, if the intervening circumstance is the discovery of an arrest warrant leading to a search disclosing incriminating evidence, no such concerns come into play, since no conduct of the suspect need be evaluated for taint. 111 F.3d at 522. While that is true, the argument demonstrates the fallacy of applying the *Brown* attenuation-of-taint analysis to the circumstances in *Green* or here.

First, the panel's reasoning effectively assumes the discovery of an arrest warrant to be an intervening circumstance—something independent of the illegal detention. But that necessarily is an initial proposition in dispute in conducting the *Brown* analysis. In other words, is it, in fact, an intervening circumstance or simply part of the illegal detention? If an event truly is an intervening circumstance, then a reviewing court must decide whether it has sufficient constitutional significance to purge the taint of the initial, illegal detention in the case at hand. See, *e.g.*, *United States v. Williams*, 650 F.3d 657, 669-70 (6th Cir. 2010) (The court rejects the government's argument that a suspect's statement to an officer

that he had an outstanding warrant amounts to an intervening circumstance at all and, instead, finds it to be "primary evidence" subject to suppression.); *United States v. Washington*, 387 F.3d 1060, 1072-77 (9th Cir. 2004) (court finds that law enforcement officer's giving Washington a form advising that he could refuse to sign consent to search "distinct from examples of 'intervening circumstances' that have been considered" in conducting *Brown* taint analysis, such as release from custody, appearance before a judicial officer, or consultation with counsel). Rather than addressing the point, the *Green* decision conveniently presumes it away. 111 F.3d at 522 (The panel frames the analysis this way: "Where a lawful arrest constitutes the 'intervening circumstance' (as in this case), it is an even more compelling case for the conclusion that the taint of the original illegality is dissipated."). That's neither legal argument nor sound reasoning so much as camouflaging an otherwise nettlesome obstacle to upholding a constitutionally rickety search and seizure.

More significantly, the *Brown* analysis is aimed at determining if conduct of the suspect following an illegal detention may be considered free of the taint of that Fourth Amendment violation. The *Green* decision acknowledges as much. 111 F.3d at 522. That factual scenario was not in play in *Green*, and it isn't here, either. Rather, the question is whether, for Fourth Amendment purposes, an officer's discovery of an arrest warrant somehow severs the officer's conduct in illegally detaining a person from the officer's conduct in then searching that person. The suspect's actions are beside the point, since he or she has said or done nothing incriminating. If there is no conduct of the suspect to evaluate—no confession or no consent to search—there is no reason to apply *Brown* or its factors. The point of that analysis is to determine whether the *suspect's* postdetention conduct reflects " 'sufficiently an act of free will to purge the primary taint' " of an illegal detention. *Brown*, 422 U.S. at 602 (quoting *Wong Sun*, 371 U.S. at 486.). In *Brown*, the Supreme Court did not intend to address whether some other kind of event or circumstance might bisect ongoing police conduct thereby separating an illegal detention from the later discovery of incriminating evidence in a way that would leave the evidence con-

stitutionally uncontaminated. Nothing in *Brown* suggests the Court expected or even contemplated its analytical methodology would (or should) be used for that purpose. The *Brown* Court certainly did not consider a fact pattern of the type in *Green* or here either in outlining its holding or in dicta. See *State v. Frierson*, 926 So. 2d 1139, 1149-51 (Fla. 2006) (Pariente, C.J., dissenting) (discussing the inapplicability of the *Brown* attenuation model to an ongoing course of police conduct alone).

The proper inquiry here remains the fundamental one posed in *Wong Sun*, asking whether the evidence has been discovered "by exploitation of" an illegal detention or another Fourth Amendment violation, on the one hand, or "by means sufficiently distinguishable" from the violation to be constitutionally acceptable, on the other. Here, as in *Green*, the focus, then, must be on the actions of the officers and whether something in the "means" they employed separated the discovery of the evidence from the unconstitutional detention. As Chief Justice Pariente explained:

"When police make all the relevant decisions and take all the significant actions starting with an illegal traffic stop and concluding with the discovery of evidence in a search incident to arrest on an outstanding warrant, there is no attenuation and no unequivocal break in the chain of causation that dissipates the taint of the original police illegality." 926 So. 2d at 1155 (Pariente, C.J., dissenting).

On the facts of this case, the interaction between Moralez and Whisman demonstrates no separate or independent means. Once Whisman detained Moralez by holding his identification card for the purpose of running a warrant check, the discovery of the marijuana flowed immediately and directly from those actions. Far from breaking the causal chain, the result of the warrant check was a prominent and entirely predictable link in that chain. And, of course, the detention of Moralez violated the Fourth Amendment because it lacked any legal basis. The marijuana, then, was the illegitimate residue of a Fourth Amendment degradation, and, as such, it should have been suppressed.

Likewise, the discovery of the marijuana in Moralez' shirt pocket did not depend upon some strained or elongated "but for" causation of the type discounted in *Wong Sun*. Let's say, for example, after Moralez was arrested that morning, he was released on bond

with a first appearance date on the marijuana charge. On the appointed day, he goes to the courthouse with his shoulder bag containing his calendar, his court papers, his cell phone, and various other accouterments of modern life. Just as the bag is passing through the x-ray machine, he realizes he forgot to remove another baggie of marijuana he took to his friend's house the night before. Oops. The security officers see the image and open the shoulder bag. Moralez would have no luck in trying to suppress the second baggie of marijuana on the theory that but for his original, unconstitutional detention and arrest he never would have been at the courthouse with marijuana. That's a distinguishable means free of taint. The facts of *Wong Sun* also illustrate a classic example of dissipation of taint. After Wong Sun had been illegally arrested, he was promptly arraigned and released on his own recognizance. Several days later, Wong Sun voluntarily submitted to questioning by law enforcement officers and made incriminating statements. The Supreme Court held those statements could be used against Wong Sun because the sequence of events demonstrated a clear break between the unlawful detention and the interview. 371 U.S. at 491. Both of those illustrations, of course, also involve additional conduct by the defendant, rather than an ongoing course of police activity alone.

The *Green* panel also tosses in the argument that Avery Green's arrest on the warrant should not be voided simply because the warrant came to light in the course of an illegal detention. 111 F.3d at 521. The opinion almost breathlessly asserts a contrary result would be "startling." To be sure, as the authority I noted earlier recognizes. But that does not then lead to the conclusion that either the warrant or the arrest is somehow an intervening circumstance of such constitutional import as to immunize the search. The *Green* decision, however, says so without offering any precedent or reasoning for that leap. The authority of *ipse dixit* seems to be both all there is and quite enough for the panel. And apparently it was sufficient for the court in *Jones* as well; the decision quotes that particular section of *Green* to support the search of Jones following his arrest. *Jones*, 270 Kan. at 528.

What the argument actually shows, instead, is that courts do not extend the exclusionary rule to require the release of persons who have been arrested on lawfully issued warrants. The reasons are both practical and policy based. To prohibit the prosecution of an individual in that circumstance exacts too high a price for the constitutional error of an illegal detention without some additional, extraordinarily aggravating factors. In effect, the criminal defendant would receive an undeserved windfall, since the purpose of the exclusionary rule is not to benefit the defendant but to deter officers from repeating their unconstitutional behavior in the future. Rather, the courts have recognized that suppression of evidence obtained through an illegal detention typically offers sufficient deterrence to protect Fourth Amendment rights. It does not follow, however, that all deterrent consequences should be eliminated simply because an arrest warrant comes to light during the illegal detention. That reasoning exposes innocent citizens to unconstitutional stops and seizures, a result that seems especially disturbing in factual circumstances comparable to those in *Martin* and here where the officers had no colorable constitutional basis whatsoever for their actions.

Finally, for what it is worth, David Green's motion to suppress likely would be granted if it were filed today. In short, the outcome in *Green* no longer reflects good search and seizure law. In *Arizona v. Gant*, 556 U.S. 332, 351, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009), the Court held that officers may not search a motor vehicle incident to an arrest if the occupants have been removed from the immediate vicinity and no longer have access to the passenger compartment and if there is no reason to believe evidence related to the crime of arrest may be found in the vehicle. The purpose of such a search is to locate weapons that might be used against the officers and to secure evidence related to the arrest. 556 U.S. at 339 (The "purposes of [a search incident to arrest are] protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy."). In that case, Gant had been removed from his car and could no longer reach into it, denying him access to any weapons that might have been kept there. Because he had been arrested on a warrant for driving

with a suspended license, the officers could not have reasonably believed relevant evidence might be found in the car. Accordingly, the search of Gant's car without a search warrant violated the Fourth Amendment, and the illegal drugs found there should have been suppressed as evidence. 556 U.S. at 344, 351.

In *Green*, the gun and drugs were found in the passenger compartment of the car. The facts indicate the Green brothers had been removed from the area of the car during the warrant check and had no access to those items. The opinion does not state what crime had been charged in the arrest warrant for Avery Green. But if it were a traffic offense, a misdemeanor assault, patronizing a prostitute, or a host of other offenses, the officers would have had no reason to believe relevant evidence might be found in the car. The officers, then, would have had no basis to make a search incident to the arrest. And since the basis for the stop was constitutionally deficient, they could not have obtained a search warrant for the car, either.

## C.

Even if the reasoning of *Green* were logically sound, though it is not, the constitutional result is incompatible with the fundamental freedoms protected in the Fourth Amendment. On that basis alone, *Green* ought to be viewed cautiously as guiding authority. The case devalued precisely what the Framers sought to safeguard in the Bill of Rights generally and the Fourth Amendment in particular. To fully assess the implications of *Green*, we need to step back from the facts of that case and look more broadly at the purpose of the Fourth Amendment and how the judicial process protects the rights preserved there for each and every citizen.

The United States Supreme Court has long recognized the protections of the Fourth Amendment cannot be fully appreciated without considering the historical perspective from which the authors of the Bill of Rights performed their work. *Chimel v. California*, 395 U.S. 752, 760-61, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969) ("[T]he Amendment's proscription of 'unreasonable searches and seizures' must be read in light of 'the history that gave

rise to the words'—a history of 'abuses so deeply felt by the Colonies as to be one of the potent causes of the Revolution.' ") (quoting *United States v. Rabinowitz*, 339 U.S. 56, 69, 70 S. Ct. 430, 94 L. Ed. 653 [1950] [Frankfurter, J., dissenting]). Such consideration is not a paean to "originalism," as a theory of constitutional interpretation, but, instead, provides a fuller understanding of the scope and importance of the rights outlined there in decidedly general, if sweeping, language. As with much else in the Bill of Rights, the Fourth Amendment operates as a brake on government authority and power. The text unequivocally bans "unreasonable" searches and seizures. And in doing so, the Fourth Amendment preserves for individual citizens enumerated freedoms—privacy in one's person, one's home, and one's papers. The text further prohibits certain especially abusive government practices, particularly general warrants, through a requirement that any warrant be issued by a judicial officer upon a particularized showing of cause.

The principal evil prompting the Framers to include the Fourth Amendment in the Bill of Rights was the so-called writ of assistance. The writs, issued on the King's authority, were general warrants allowing the Crown's customs agents to search when and where they chose to find untaxed goods. *Payton v. New York*, 445 U.S. 573, 583-84 & n.21, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *Boyd v. United States*, 116 U.S. 616, 624-27, 6 S. Ct. 524, 29 L. Ed. 746 (1886) (detailed discussion of British abuses prompting inclusion of Fourth Amendment in the Bill of Rights). The agents could enter Colonists' homes or businesses at will and seize records or property essentially as they wished. During that pre-Revolutionary period, British officials also used general warrants issued without any supporting evidence to arrest political dissidents in England for publishing commentary critical of the ruling authorities. *Boyd*, 116 U.S. at 625-26; Hubbart, Making Sense of Search and Seizure Law: A Fourth Amendment Handbook, at 40-41 (2005). In one such sweep, 49 purported seditionists were arrested in a 3-day period, as agents of the King searched homes and seized personal papers of many others, as well. Hubbart, Search and Seizure, at 40-41. Some 2 centuries after the adoption of the Bill of Rights, we continue to measure the cut of the Fourth Amendment

by the pattern of abuses visited upon English citizens in the name of the king. *Chimel*, 395 U.S. at 761 ("The Amendment was in large part a reaction to the general warrants and warrantless searches that had so alienated the colonists and had helped speed the movement for independence."); *Stanford v. Texas*, 379 U.S. 476, 482, 85 S. Ct. 506, 13 L. Ed. 2d 431 (1965) (noting antipathy toward both the use writs of assistance in the Colonies and the use of general warrants to suppress dissenting political voices in England as animating inclusion of the Fourth Amendment in the Bill of Rights). Ultimately, however, the language of the Fourth Amendment protects the citizenry against a much broader range of abuses than merely general warrants. *Payton*, 445 U.S. at 585 ("It is thus perfectly clear that the evil the [Fourth] Amendment was designed to prevent was broader than the abuse of a general warrant. Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language . . . of the Amendment.").

The police conduct in this case and that described in *Martin* are essentially direct lineal descendants of the pre-Revolutionary abuses perpetrated through general warrants—government agents' interdiction of citizens without any showing of cause. Some would no doubt say what happened to Moralez is different, especially given the brevity of his illegal seizure. But the fundamental abuse remains the same more than 2 centuries later. Moralez was detained absent any lawful justification. Just as the King's revenue officers needed no particularized reason to search a given home or seize a given person's private papers, Whisman acted without any legally accepted ground (because he had none) in detaining Moralez. The difference, if there actually is one, must be measured by degree rather than kind.

The decision in *Green* and those patterned on it invite what the Framers sought to prevent; they do so by neutralizing the most effective remedy to prevent that sort of abuse. They refuse to enforce the exclusionary rule and, instead, allow the police to use evidence discovered through unconstitutional seizures of individuals made without any legitimate reason. In turn, they encourage government agents to detain anyone and everyone—not just those

with larceny or some other crime in their hearts—without cause and to subject those detained to interrogation, warrant checks, and other investigation.

The Fourth Amendment—if it means anything at all—should prohibit a government agent from accosting and detaining a person absent some genuine police purpose entailing at the very least a reasoned conclusion that the individual has been or is engaged in unlawful activity. We did not form a society that permits those possessed of guns and badges to randomly or selectively detain citizens upon caprice or chimera. In that society, law enforcement would trade upon tactics we customarily ascribe to antidemocratic juntas or Orwellian dystopias. Allowing agents of a government to seize citizens, even briefly, without reason or cause would have been unthinkable to those who founded this Nation. We do a grave disservice to their vision of freedom and the properly constrained role of government when we effectively give license to the police to do just that. See *Brinegar v. United States*, 338 U.S. 160, 180, 69 S. Ct. 1302, 93 L. Ed. 2d 1879 (1949) ("Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.") (Jackson, J., dissenting).

D.

The principal protection against violations of the Fourth Amendment lies in the exclusionary rule. *Herring v. United States*, 555 U.S. 135, 139-40, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009); *Elkins v. United States*, 364 U.S. 206, 217, 80 S. Ct. 1437, 4 L. Ed. 2d 1669 (1960). As I have noted, the rule bars the admission of evidence—both contraband and other materials—in a criminal prosecution when government agents have acted deliberately or recklessly in obtaining that evidence contrary to settled Fourth Amendment principles. The courts have long recognized the exclusionary rule to be the most effective way of compelling law enforcement officers to obey the constitutional limitations on their power to seize individuals and to search for evidence. *United States v. Leon*, 468 U.S. 897, 908-09, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) ("The Court has, to be sure, not seriously questioned, 'in the absence of a more efficacious sanction, the continued appli-

cation of the rule to suppress evidence from the [prosecution's] case where a Fourth Amendment violation has been substantial and deliberate.' "; *Mapp v. Ohio*, 367 U.S. 643, 654-55, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) (In holding the exclusionary rule should apply to state and local government agents, the Court recognizes that without the rule, the protections of the Fourth Amendment would be reduced to " 'a form of words,' valueless and undeserving of" a place in the Constitution.). The rule dates back nearly a century. *Weeks v. United States*, 232 U.S. 383, 392-93, 34 S. Ct. 341, 58 L. Ed. 652 (1914) (ordering suppression of business records and other papers seized by a U.S. marshal without a warrant); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 391-92, 40 S. Ct. 182, 64 L. Ed. 319 (1920).

The premise of the rule is fairly straightforward: If law enforcement officers know they cannot benefit from their violations of the Fourth Amendment, then they will not commit those violations. The rule, thus, serves to deter or prevent unconstitutional searches and seizures by giving notice to those officers that any useful evidence they might obtain will be barred in a later criminal prosecution. *Herring*, 129 S. Ct. at 699. (The exclusionary rule is " 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.' ") (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 38 L. Ed. 2d 561 [1974]); *Elkins*, 364 U.S. at 217 (The exclusionary rule's "purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."). Accordingly, officers will not engage in behavior violating the Fourth Amendment in the first place. See *Leon*, 468 U.S. at 919. And that keeps innocent citizens simply going about their business from being subjected to that sort of impermissible police conduct. Supreme Court Justice Robert Jackson elegantly explained the exclusionary rule some 60 years ago:

"But the right to be secure against searches and seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court.

"Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence

and the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. . . .

"Courts can protect the innocent against such invasions indirectly and through the medium of excluding evidence obtained against those who frequently are guilty. Federal courts have used this method of enforcement of the Amendment, in spite of its unfortunate consequences on law enforcement." *Brinegar*, 338 U.S. at 181 (Jackson, J., dissenting).

See also *Elkins*, 364 U.S. at 217 (majority opinion quotes this passage of Justice Jackson's dissent as aptly encapsulating the operation of the exclusionary rule).

The Fourth Amendment and, hence, the exclusionary rule are not confined just to on-the-street encounters between citizens and police. The Fourth Amendment, for example, prevents the government from tapping a person's telephone or otherwise eavesdropping on private conversations without good cause and a proper search warrant, see *Katz v. United States*, 389 U.S. 347, 357-59, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), or from seizing business or personal papers unless they have some bearing on suspected illegal activity and have been sufficiently described in a warrant, see *Cassady v. Goering*, 567 F.3d 628, 635 (10th Cir. 2009) (collecting cases). But without the exclusionary rule, law enforcement agents would have no tangible incentive to abide by those constitutional restrictions.

In short, the exclusionary rule aims to secure the constitutional rights of the average citizen. That is the undeniably meritorious end or goal. The means to reaching that end, however, has the immediate effect of making it more difficult to prosecute an accused criminal in a specific case by barring the use of evidence obtained in violation of the Fourth Amendment. But we have struck a balance in which those ends—protecting everyone's freedom from unreasonable government searches and seizures—justify the means.

The exclusionary rule, however, also comes with significant limitations on its scope. It is not an automatic get-out-of-jail-free card, but, rather, a calibrated device intended to effectuate compelling constitutional goals. First, a person can only assert his or her own

Fourth Amendment rights. He or she must have standing to raise the constitutional violation. Accordingly, for example, drugs illegally seized from a car may not be used as evidence against the owner of the car, but they can be against his or her partners in a conspiracy to distribute the drugs. See, *e.g.*, *Leon*, 468 U.S. at 910 (discussing standing requirement). That is not an issue here, since Moralez was personally subject to the illegal detention and resulting search. Second, the rule will not bar evidence if the law enforcement officer has acted in "good faith" in conducting the search or seizure. 468 U.S. at 918-19. For example, if an officer has obtained a search warrant from a judge and the warrant later is determined to be legally insufficient, any evidence seized probably will be admissible anyway because the officer did nothing wrong and reasonably relied in good faith on the judge's determination in signing the warrant. The good-faith exception does not come into play here because Whisman reasonably should have known that he could not have detained Moralez for a warrant check without some objective basis to believe Moralez had broken the law. Third, the exclusionary rule bars only that evidence seized illegally. It does not otherwise prevent prosecutors from pursuing criminal charges if they have other evidence, as well. Here, of course, apart from the marijuana itself, there apparently would have been no evidence against Moralez. If the motion to suppress were granted, as it should have been, the prosecutors almost certainly would have had to dismiss the charge. Moralez would have gone free.

Viewed narrowly, the exclusionary rule does have the peculiar result of aiding those charged with criminal offenses. But that is the paradox of the rule itself; by affording relief to an accused criminal now, it curtails abusive government behavior that just as likely would be directed at an innocent person in the future. And that is the failing of decisions such as *Green*. They contrive ways to preserve evidence in a given criminal case at the expense of each citizen's Fourth Amendment rights. As a result, Officer Whisman, the rest of the Topeka Police Department, and law enforcement officers across the state now have little practical reason to refrain from stopping anyone walking down the street, demanding some

form of identification from that person, and running a warrant check. They may do so just because they don't like someone's looks or on the mere hope that a warrant will turn up. That is constitutionally unacceptable.

E.

Other courts have split on the admissibility of evidence uncovered in a search following the discovery of an arrest warrant during an otherwise unconstitutional detention. The issue has divided judges on the same court, as well. My canvass of that authority has been extensive, though not exhaustive. I do not purport to have found or looked at every appellate decision, but what I cite here is at least a substantial cross-section.

A number of courts have applied *Green* reflexively and without much independent review or analysis of its reasoning and its implications. *State v. Page,* 140 Idaho 841, 845-47, 103 P.3d 454 (2004); *State v. Hill,* 725 So. 2d 1282, 1285 (La. 1998); *Hill,* 725 So. 2d at 1289 (Johnson, J., dissenting) (noting majority's heavy and misplaced reliance on *Green*); *Myers v. State,* 395 Md. 261, 287-88, 293-94, 909 A.2d 1048 (2006); *Jacobs v. State,* 128 P.3d 1085, 1088 & nn. 15, 18-19 (Okla. Crim. App. 2006). See also *United States v. Simpson,* 439 F.3d 490, 495-96 (8th Cir. 2006) (The court applies *Green* after assuming for purposes of argument that the initial detention of the defendant violated the Fourth Amendment, although the stated facts plainly outline a constitutionally valid seizure.). Some muddle the issues. For example, the Oklahoma Court of Appeals stressed that law enforcement officers ought to be permitted to arrest a person on an outstanding warrant even if it comes to light during an illegal detention. *Jacobs,* 128 P.3d at 1089. That, as I have noted, is a classic strawman argument, since no one argues otherwise. The issue here and in the other cases bears on whether *evidence* uncovered following such an arrest may be used to prosecute the person illegally detained.

Those courts, of course, universally apply the attenuation analysis *Green* improvidently borrows from *Brown*. They often compound that error by misconstruing the flagrancy component of the analysis as weighing primarily the physically intimidating character

of the officers' conduct as opposed to the patent quality of the constitutional violation. *Page*, 140 Idaho at 845-47. Certainly, an agent's overbearing physical presence or action may contribute to the manner of the illegal seizure, but it is hardly a necessary condition for a "flagrant" violation of a citizen's Fourth Amendment rights.

After having apparently struggled with this issue for 15 years, the Ohio courts have staked out, perhaps, the most extreme position. *State v. Harding*, 180 Ohio App. 3d 497, 504, 905 N.E.2d 1289 (2009), *cert. denied* 559 U.S. 1052 (2010) (After describing four appellate decisions arriving at various and conflicting resolutions, the court characterizes the question as one "not free from difficulty."). The Ohio courts have concluded that a person subject to an outstanding arrest warrant "ha[s] no reasonable expectation of privacy" and, as a result, "an otherwise unlawful stop is justified by the existence of [that] warrant." 180 Ohio App. 3d at 504. The majority explained its view this way:

"Perhaps the best argument in favor of upholding an otherwise unjustified stop of an individual who is subject to an outstanding arrest warrant is that the authority for the stop, and the resulting intrusion upon the individual's liberty, is not predicated upon any facts or circumstances known to the stopping officer, but upon the independent authority of the arrest warrant, itself, thereby making the facts and circumstances known to the officer immaterial." 180 Ohio App. 3d at 504.

The result seems to be that a person wanted on an arrest warrant in Ohio has no Fourth Amendment protections against an unreasonable search and seizure. In turn, the Ohio courts presumably would never invoke the exclusionary rule to suppress evidence in that circumstance. The dissenter in *Harding* saw it that way. 180 Ohio App. 3d at 505 ("The majority's decision represents a complete abandonment of the application of the exclusionary rule in any illegal detention and seizure" where an arrest warrant is "later discover[ed]."). And that makes anyone prey for an unconstitutional police stop and warrant check in Ohio.

Others decisions have upheld searches based on the discovery of arrest warrants following traffic stops for which the officers articulated reasons the courts found to be legally insufficient but, nonetheless, reflective of objective good faith. That is, the officers

provided specific grounds for their initial stops that the courts deemed less than a reasonable suspicion or probable cause, yet not so inadequate as to be plainly deficient to a well-trained officer. *People v. Brendlin*, 45 Cal. 4th 262, 271-72, 85 Cal. Rptr. 3d 496, 195 P.3d 1074 (2008); *Frierson*, 926 So. 2d at 1144-45. The *Brendlin* court, however, suggested it likely would favor suppressing evidence if an officer seized an individual on grounds that were "flagrantly or knowingly unconstitutional" notwithstanding the later discovery of an arrest warrant. *Brendlin*, 45 Cal. 4th at 272. The majority opinion in *Frierson* can be read the same way. 926 So. 2d at 1146-47 (Anstead, J., concurring). Several years ago, the Sixth Circuit similarly limited *Green* by suggesting that evidence should be suppressed when it comes to light as the direct result of a law enforcement officer's intended purpose in effecting an unconstitutional stop or seizure. *United States v. Hudson*, 405 F.3d 425, 439-41 (6th Cir. 2005). Under the facts here, Whisman's conduct would be found constitutionally wanting in those courts, since he detained Moralez without any legal basis for the express purpose of running a warrant check—to determine, presumably, if Moralez were wanted and, thus, subject to formal arrest, including a full search.

On facts strikingly similar to those here, the Illinois Court of Appeals distinguished *Green* on precisely that basis and found the seizure (and following search) of a person out for a walk to be constitutionally unacceptable. *People v. Mitchell*, 355 Ill. App. 3d 1030, 1037-38, 824 N.E.2d 642, *appl. denied* 215 Ill. 2d 611 (2005). An apparent insomniac, Marshall Mitchell took a walk about 5 a.m. because he couldn't sleep. Two Rockford, Illinois, police officers stopped him. At a suppression hearing, the lead officer testified the duo had no reason to suppose Mitchell was either in need of help or up to no good. They engaged Mitchell in conversation, and he explained his nocturnal stroll. The officers asked for Mitchell's identification. He handed over an identification card of some kind. The lead officer then took the card and ran a warrant check on Mitchell. Mitchell came up wanted for failing to appear on a traffic citation. The officers arrested Mitchell and had him transported to jail. During the booking process, the jailers searched Mitchell and

found a small amount of cocaine. Charged with a drug offense, Mitchell moved to suppress the cocaine.

The Court of Appeals held that taking Mitchell's identification effected a seizure of him under the Fourth Amendment. And, since the officers had no lawful basis to detain Mitchell, their actions violated his constitutional rights. 355 Ill. App. 3d at 1036-39. The prosecutor invoked *Green* to argue that the arrest warrant dissipated the taint of the illegal detention, leaving the search constitutionally unsullied. 355 Ill. App. 3d at 1036-37. The Court of Appeals rejected the argument and distinguished *Green*. While accepting the premise of *Green* that the discovery of an arrest warrant could be an intervening circumstance favoring attenuation in some situations, the court reasoned that the officers stopping the Green brothers had a legitimate investigatory purpose for the detention, albeit one ultimately found to be legally insufficient. Conversely, the Rockford officers had no basis to interdict Mitchell; their purpose in seizing him and taking his identification was to run a warrant check. That led directly to the discovery of the warrant, the arrest, and the search revealing the illegal drugs. 355 Ill. App. 3d at 1037-38. The court explained: "[T]he answer to the question, whether the evidence was obtained by exploiting the original illegality, is undeniably yes." 355 Ill. App. 3d at 1038. In reaching the conclusion to suppress the evidence against Mitchell, the court pointed out that applying the exclusionary rule "appears to be the only way to deter the police from randomly stopping citizens for the purpose of running warrant checks" and, in turn, to prevent them from "stop[ping] whomever they please to check for a warrant." 355 Ill. App. 3d at 1038.

Many courts have wisely rejected outright *Green* (or identical legal reasoning) and the resulting contraction of Fourth Amendment protections. *United States v. Gross*, 624 F.3d 309; *People v. Padgett*, 932 P.2d 810, 816-17 (Colo. 1997) (In a case decided several months before Green, the Colorado Supreme Court declined to find that discovery of a possible warrant for a person being unlawfully detained validated a search turning up contraband.); *Sanchez v. State*, 803 N.E.2d 215, 223 (Ind. App.), *transfer* denied May 7, 2004 (court holds discovery of arrest warrant not interven-

ing circumstance purging taint of illegal detention so as to permit use of evidence found during search incident to arrest); *State v. Soto*, 143 N.M. 631, 636-37, 179 P.3d 1239 (Ct. App. 2008) (court expressly declines to follow Jones and, instead, holds that officers' discovery of outstanding arrest warrant insufficient to rescue search when individual had been unconstitutionally detained); *State v. Daniel*, 12 S.W.3d 420, 428 (Tenn. 2000) (finding no intervening circumstance when officer illegally detained individual, conducted warrant check, and found marijuana in search incident to arrest on outstanding warrant); *State v. Topanotes*, 76 P.3d 1159, 1163-64 (Utah 2003) (Without citing *Green*, the court suppresses evidence seized from Topanotes after she was unlawfully detained and a warrant check revealed an outstanding want for her.).

In *Gross*, the Sixth Circuit went further than its earlier decision in *Hudson*, which distinguished *Green* on its facts, to reject outright the argument that discovery of an arrest warrant amounts to an intervening circumstance sufficient to constitutionally immunize a search conducted in the course of an illegal detention. 624 F.3d at 320-21. The Sixth Circuit recognized that endorsing such a rule would effectively hand law enforcement agents a license to abandon any requirement they have reasonable suspicion or probable cause before seizing and detaining a person simply going about his or her business, thereby negating "the very crux of our Fourth Amendment jurisprudence." 624 F.3d at 320-21. The court warned that the reasoning of *Green* "has the perverse effect of encouraging officials to engage in illegal stops when they have an [inarticulable] hunch regarding a person on the street or in a car." 624 F.3d at 321.

Those judges questioning either the propriety of *Green* as sound constitutional doctrine at all or its broad application commonly return to the degradation of Fourth Amendment freedoms as the pernicious fallout from that course of reasoning. See, *e.g.*, *Mitchell*, 355 Ill. App. 3d at 1038; *Frierson*, 926 So. 2d at 1147 (Anstead, J., concurring). As Judge Anstead pointed out:

"In our society the police are vested with the awesome authority to interfere with a citizen's personal freedom. Personal freedom is, of course, our most cherished value. Our courts must be ever vigilant to be certain that the police do not

abuse their awesome authority and our citizens' personal freedom is protected." *Frierson*, 926 So. 2d at 1147.

Too often, however, the decisions declining to suppress evidence based on the reasoning of *Green* do so without considering the constitutional price paid in freedom lost. They do not mention and, thus, seemingly fail to consider the purpose and effect of the exclusionary rule in shaping the behavior of law enforcement agents. In their failure, those rulings prompt the sort of unconstitutional detention visited upon Martin and Moralez here in Kansas. And each of us now has become a potential target. The authors of the Bill of Rights would shudder at that crippling of the Fourth Amendment. All I can do is dissent from it.